No. 24-1191

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**WILBERT FINLEY**

Plaintiff – Appellant,
v.
**KRAFT HEINZ INC.**

Defendant - Appellee
.

---

**OPENING BRIEF OF APPELLANT**
**ON APPEAL FROM A FINAL JUDGMENT OF THE U.S. DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA**
(No. 8:22-cv-426-TMC)

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501

Counsel for Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1191 Caption: Finley v. Kraft Heinz, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Wilbert Finley
(name of party/amicus)

who is Appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Thad M. Guyer Date: 11-04-2024

Counsel for: Appellant



Print to PDF for Filing Reset Form

**TABLE OF CONTENTS**

I. DISCLOSURE STATEMENT FORM ....... 6
II. JURISDICTIONAL STATEMENT ....... 6
III. ISSUES PRESENTED FOR REVIEW ....... 6
IV. STATEMENT OF THE CASE ....... 7
A. Nature of the Case ....... 7
B. Course of Proceedings ....... 7
C. Disposition Below ....... 8
V. STATEMENT OF THE FACTS ....... 8
A. Kraft Heinz's Commitment to Food Safety Is Confined to Paper Policies ....... 8
1. Mr. Finley Was The Employee Associated With Raising and Pursuing Safe Resolution to the Bone Issues Throughout February – March of 2020 ....... 11
2. Mr. Finley Put His Career In Harm's Way By Continuing to Press Management to Destroy the Dangerous Meat ....... 12
B. The Company Terminated Finley's Employment In Retaliation for His Disclosures ....... 13
1. Kraft Heinz Did Not Meet Even The Basic Requirements For a Credible Investigation ....... 15
2. The Shifting Reasons for the Termination of Finley Provide Pretext ....... 19
C. Finley Was Treated Much Worse Than Any Other Comparator ....... 20
D. The Investigation of Finley's Retaliation ....... 22
VI. REPORT OF MAGISTRATE AND DISTRICT COURT ORDER ADOPTING REPORT ....... 23
A. Background Facts ....... 23
B. The Plaintiff's Food Safety Complaints ....... 23
C. Termination of Hourly Workers Gaines ....... 27
D. The Plaintiff's Employment Termination ....... 27
VII. THE MAGISTRATE AND DISTRICT JUDGE WEIGHED ALL EVIDENCE AND GAVE EVERY FAVORABLE INFERENCE TO THE DEFENDANT. ....... 30
A. Close Temporal Proximity: ....... 30

B.Company Statistic on Punishing "Dishonesty": ........................................30

C.Some Evidence of Dishonesty is Enough: ............................................31

D.Criticisms of the Investigation: ........................................................32

E.Shifting Explanations for Termination: ..............................................34

F.False Statements to OSHA Investigators: ...........................................36

G.Evidence that Only Plaintiff Was Punished for Widespread Failures: ......37

VIII. STANDARD OF REVIEW ......................................................................37

IX. SUMMARY OF ARGUMENT ....................................................................39

A.Fact Summary: ........................................................................................39

B.Argument Summary: ...............................................................................43

ARGUMENT ..................................................................................................45

X. TIME PROXIMITY ALONE MET FINLEY'S CONTRIBUTING FACTOR BURDEN..........................................................................................................45

XI. INTENT AND CAUSATION ARE NOT BURDENS ON FINLEY ..............47

A.Only FMSA Statutory Standards Apply, Not from Title VII or Common Law...........................................................................................................47

B.Murray v. UBS (2024) Has Abrogated the District Court Judgment: .......49

C.Once Established Contributing Factor Cannot be Un-established ............50

D. The Magistrate Conflated the Comparable Burdens of Proof of the Parties ...............................................................................................................51

XII. THE DISTRICT COURT IMPERMISSIBLY LIMITED THE REACH OF RELEVANT EVIDENCE ...............................................................................52

XIII. THERE IS DISPUTED EVIDENCE AS TO WHETHER KRAFT HEINZ WOULD HAVE TERMINATED FINLEY ABSENT HIS PROTECTED ACTIVITY.......................................................................................................53

XIV. THIS COURT MUST HOLD DISTRICT COURTS TO THE MANDATES OF MURRAY V UBS .....................................................................................54

A.The End of Intent and Causation in Modern Whistleblower Statutes:......54

B.Murray v. UBS Governs FMSA Cases: ....................................................55

C.The District Court Did Not Address Finley's Pre-Murray Arguments: .....55

XV. COURTS MUST RESPECT CONGRESS' DECISION TO ALLOW RELIEF WITHOUT ANIMUS, INTENT OR CAUSATION ......... 56

XVI. CONCLUSION ......... 57

STATEMENT REGARDING ORAL ARGUMENT ......... 58

CERTIFICATE OF COMPLIANCE ......... 59

CERTIFICATE OF SERVICE ......... 60

## TABLE OF AUTHORITIES

### Statutes

21 U.S. Code § 399d(b)(2)(C)(iii)....................57
21 U.S.C. § 399d(a)(1)....................49
45 U.S.C. § 51....................58
49 U.S.C.A. § 42121 (b)(2)(B)(i)....................56

### Rules

Fed. R. Evid. 401....................46

### Fourth Circuit Cases

*Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024)....................47
*Barrick v. Pngi Charles Town Gaming, LLC*, 799 F. App'x 188, 189-90 (4th Cir. 2020)
....................51
*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)....................54
*Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023)....................39
*Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)....................50
*Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015)....................47
*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)....................40
*Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223-34 (4th Cir. 2019)....................51
*Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315–16 (4th Cir. 1993)....................46
*Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001)....................50
*PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011)....................39
*Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021)....................55
*Roberts v. Glenn Indus. Grp., Inc.,* 998 F.3d 111, 123 (4th Cir. 2021)....................48
*Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156, 164
(4th Cir. 1997)....................39
*Salley v. Myers*, 971 F.3d 308, 312 (4th Cir. 2020),....................40
*Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000)....................46
*Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017)....................55
*Whittaker v. Morgan State Univ.,* 524 F. App'x 58, 60 (4th Cir. 2013)....................46

*Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). ..............................48

*Ziskie v. Mineta,* 547 F.3d 220, 225 (4th Cir.2008) ..................................................46

**Supreme Court Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). .......................................39

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ..................................................40

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)......................................48

*Colorado v. New Mexico*, 467 U.S. 310, 316 (1983)..................................................56

*CSX Transp., Inc. v. McBride*, 564 U.S. 685, 695–96 (2011).....................................58

*Mathews v. Weber*, 423 U.S. 261, 270–71 (1976) ......................................................39

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .........................................49

*Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024) ...........................................................50

*Thompson v. Clark*, 596 U.S. 36 (2022)......................................................................40

*Thornburg v. Gingles*, 478 U.S. 30, 72–74 (1986) ......................................................59

*United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962) ..........................................39

**Other Federal Court Cases**

*Burton v. Food Giant Supermarkets, Inc*., No. 1:19-cv-2445-JDB-JAY, 2021 WL 3574885, at *8 (W.D. Tenn. Aug. 12, 2021); ..........................................................55

*Byron v. Inst. for Env't Health, Inc*., 428 F.Supp.3d 467, 471 (W.D. Wash. Dec. 19, 2019)...................................................................................................................49

*Chase v. Bros. Int'l Food Corp*., 3 F.Supp.3d 49, 53 (W.D.N.Y. 2014),......................49

*Donnelly Corp. v. Gentex Corp*., 913 F. Supp. 1014, 1020 (W.D. Mich. 1995) .........56

*Greenup v. CSX Transp., Inc*., 2019 WL 3464632, at *2 (D. Md. July 31, 2019).......51

*Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997).......56

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 U.S. Dist. LEXIS 2548 (C.D. Cal. Jan. 11, 2011).......................................................................................56

## I. DISCLOSURE STATEMENT FORM

See above.

## II. JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim arises under federal law, specifically the Food Safety Modernization Act, 21 U.S.C. § 399d. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court. The district court entered final judgment granting summary judgment to Defendant on January 30, 2024. Plaintiff filed a timely notice of appeal on February 28, 2024.

## III. ISSUES PRESENTED FOR REVIEW

` 1. Whether the district court erred in granting summary judgment to Defendant on Plaintiff's Food Safety Modernization Act retaliation claim by:

a. Failing to adhere to the golden rule of summary judgment by improperly weighing evidence, making credibility determinations, and failing to draw all reasonable inferences in Plaintiff's favor;

b. Disregarding evidence relevant to pretext for issues other than pretext;

c. Misapplying legal standards for causation and pretext in FSMA retaliation cases.

2. Whether the Supreme Court's decision in *Murray v. UBS* (2024) requires reversal.

3. Whether the district court erred in concluding that no reasonable jury could find that Plaintiff's protected activity was a contributing factor in his termination, despite evidence of:

a. Close temporal proximity between Plaintiff's protected activity and his termination;

b. Direct references to Plaintiff's protected activity within the investigation;

c. Shifting and inconsistent explanations for Plaintiff's termination;

d. An incompetent and poorly documented investigation;

e. Evidence that decision-makers were aware of and displeased by Plaintiff's protected activity.

## IV. STATEMENT OF THE CASE

### A. Nature of the Case

This is an appeal from the district court's grant of summary judgment to Defendant Kraft Heinz, Inc. on Plaintiff Wilbert Finley's claim of retaliation in violation of the Food Safety Modernization Act (FSMA), 21 U.S.C. § 399d. Finley alleges he was terminated from his position as a production manager at Kraft Heinz's Newberry, South Carolina plant in retaliation for raising food safety concerns protected under the FSMA.

### B. Course of Proceedings

Finley filed his complaint on February 10, 2022, asserting claims for: (1) retaliation in violation of the FSMA, and (2) wrongful discharge in violation of South Carolina public policy. On February 13, 2023, the district court dismissed

Finley's state law wrongful discharge claim. Kraft Heinz then moved for summary judgment on Finley's remaining FSMA retaliation claim. On July 13, 2023, the magistrate judge issued a Report and Recommendation recommending that summary judgment be granted to Kraft Heinz. Finley filed objections to the Report and Recommendation on August 14, 2023. On January 30, 2024, the district court adopted the magistrate judge's recommendation and granted summary judgment to Kraft Heinz. Finley timely appealed. Thereafter, the Supreme Court decided Murray v. UBS.

### C. Disposition Below

The district court granted summary judgment to Kraft Heinz on Finley's FSMA retaliation claim. The court concluded that Finley failed to establish a prima facie case of retaliation because he could not show that his protected activity was a contributing factor in his termination.

## V. STATEMENT OF THE FACTS

### A. Kraft Heinz's Commitment to Food Safety Is Confined to Paper Policies

Kraft Heinz' practices deviate drastically from the written policies they claim to enforce in their Motion. First, Kraft Heinz touts its "Food Defense Policy" requiring employees to speak up about actual or potential violations of the Food Defense Policy. Yet, Kraft Heinz' Area Production Manager Cumeico Debrick, who worked for Kraft Heinz for sixteen years, explained: "Though I supported

Finley's food safety concerns, I was scared to escalate them further."[1] Kraft Heinz Supervisor Marquis Glanton shared the concern and belief that employees were fearful to push food safety issues, noting: "The safety culture at the Kraft Heinz Newberry Plant is not good. Employees fear and expect to be fired if they push food safety issues. I shared that fear." [2] Debrick heard the same from other employees with regards to Finley's attempts to stop Kraft Heinz from sending out bone tainted meat: "And the conversations going around were more Bert better slow down before he gets termed, because he wanted to throw all that bacon away."[3] Glanton "believed Mr. Finley was terminated because he made reports about food safety."[4] Far from receiving concerns with an open door and open mind, Debrick recalls Quality Director Janice Ball stating "she didn't care what Bert's opinion was."[5]

In 2015, the USDA Food Safety and Inspection Service (FSIS) announced that Kraft Heinz' Newberry Plant had to recall 2 million pounds of its turkey bacon when the USDA FSIS received reports of illness from consumers --and Kraft

---

[1] Debrick Decl. para 12. JA 458

[2] Glanton Dec. para. 14 JA 587

[3] Debrick Depo, 36-37 JA 504-505

[4] Glanton Dec., para. 14 JA 587

[5] Debrick Depo. 68: 10-15 JA 510

Heinz conceded the meat may spoil before the expiration date.[6] In 2019, plastic and metal was in the product.[7] In 2021, they had pieces of metal or glass.[8] Based on other recalls, Kraft Heinz should know the presence of bone in its "ready to eat" products constitutes contamination and can also lead to injury, illness and/or recalls due to "high risk" of injury to the consumer.[9]Finley informed management and HR that short staffing was presenting significant problems, which included the risk that the company could not maintain adequate safety without adequate staffing to perform visual and tactile food safety surveillance:[10] Finley stated:

> When you have a set head count to run a line, it's because everyone has an obligation to make sure that the meat that is being processed is not only processed and packaged correctly, but make sure that the meat that you're packaging has a set of eyes on it so that it's being inspected as it's being packaged. More eyes on the – on the process, the better it is. You should never run with less than what you need in order just to hit the numbers, and unfortunately there were times when we did do that.[11]

Far from just a body count, there were significant impacts to quality and threats to food safety from not having the properly qualified staff.[12]

---

[6] Ayers Dec., Ex. 1 JA 427-433

[7] Ayers Dec., Ex. 2 JA 434-438]

[8] Ayers Dec., Ex. 3 recall notice for plastic JA 439-444

[9] Ayers Dec., Ex. 4 FSIS Announcement Recall JA 445-451

[10] Finley Dec., para. 26 JA 548-549

[11] Id.

[12] Finley Dec., para. 4 JA 541-543

Mr. Finley's MBO issued February 6, 2020 shows that Kraft Heinz could not fairly criticize his performance and had to acknowledge he was performing his duties at a score of 100%.[13] Scores on MBOs are compiled at the end of the year for bonus purposes, and based on his qualifying numbers, Mr. Finley received his bonus in March 2020.[14]

### *1. Mr. Finley Was The Employee Associated With Raising and Pursuing Safe Resolution to the Bone Issues Throughout February – March of 2020*

There was no more vocal, or more insistent, reporter and escalator of the unsafe bone issues than Mr. Finley.[15] He was taking photographs, creating graphs, consulting with the RAW side and management, and carrying packages of meat with bone into Harp's office, over and over, throughout the day:

> So quality determined that we were going to run the product, Bert said no, he didn't want to run the product, and we would go into our meetings and he would go back and forth, saying -- like throughout the entire day, *** Bert would grab packages off the bacon line and bring them into the office and open them up and, you know, show all the bone fragments that were in the bacon, and he'd go into Josh's office***[16]

---

[13] Ayers Dec., Ex. 5 MBO review JA 452-455

[14] Finley Dec., para. 47 JA 554-555

[15] Debrick Depo. 35:10-25 JA 503

[16] Debrick Depo. 35:10-25 JA 503, with graphs JA 475-484

By stark contrast, Mr. Clark testified he never reported he was concerned about the amount of bone in the meat[17] and specifically denied that he ever engaged in the level, extensiveness, or type of advocacy to get resolution of the unsafe meat that Finley did.[18]

### *2. Mr. Finley Put His Career In Harm's Way By Continuing to Press Management to Destroy the Dangerous Meat*

Former Area Production Manager Cumeico Debrick testified that Finley was pushing the bone issues to the point of danger of termination:

> *** We had so much bone in our bacon at the time. *** the employees were frustrated, quality was frustrated, I was frustrated because I was tired of hearing about it and I wanted to talk about my own process, but it took priority, and I understood why, and Bert would not let it go.[19]

Finley was repeatedly and vociferously at odds with Kraft Heinz management as to how the turkey bacon should be processed:

> *** So quality determined that we were going to run the product, Bert said no, he didn't want to run the product, and we would go into our meetings and he would go back and forth*** throughout the entire day, Bert would grab packages off the bacon line and bring them into the office and open them up and… show all the bone fragments that were in the bacon, and he'd go into Josh's office***[20]

---

[17] Clark Depo. 57: 5-7 JA 521, and Ayers Dec. Ex 9 JA 475-484]

[18] Clark Depo. 59: 1-21 JA 523

[19] Debrick Depo. 34:11-25 JA 502-503

[20] Debrick Depo. 35: 10-25 JA 503

Glanton similarly witnessed Finley's reports to Quality and Harp, and heard of Harp's order to process the meat regardless:

> There was a period of time throughout February – March 2020 where the turkey bacon was hitting a very large number of bone fragments. I accompanied Mr. Finley when he went to the OQ office during this time (with Wanda Wright and others present) to tell Quality that there were too many bones in the meat to safely run it.[21]

On March 9, 2020, Finley brought his concerns to the attention of HR anew when he texted Wilson with a publicly available YouTube link highlighting the fact that now Kraft Heinz was having a dangerous bone in the meat issue.[22] Debrick noted:

> *The bone in the meat was a food safety risk*. Quality overrode that concern and said to slice it anyways. ***. After listening to Mr. Finley explain the situation, *it was very concerning for the safety of consumers eating the bacon.* [23]

(Emphasis added).

**B. <u>The Company Terminated Finley's Employment In Retaliation for His Disclosures</u>**

Based on Supervisor Glanton and Supervisor Tracey's over ten years of Kraft Heinz knowledge and experience, it is the Supervisor's responsibility to walk

---

[21] Glanton Dec. para. 6 JA 585

[22] Ayers Dec., Ex. 10 JA 485-491

[23] Kraft Heinz also claimed falsely in its Nov. 16, 2020 OSHA Letter at p. 11 that Finley "never voiced an objection to improper use of the x-ray machines." Ayers Dec., Ex. 7 JA 459-460. Not only did Mr. Finley object, his colleagues remember him objecting multiple times to multiple people. Debrick Dec. para. 11 JA 458

out employees.[24] Managers like Mr. Finley do not walk out hourly employees.[25] Based on Kraft Heinz practices, thus the supervisor below Finley (Bobby Clark) was responsible for walking out Gaines.[26] Clark specifically denied that he ever assigned a walkout of an employee for attendance to Finley, who was his boss.[27] Finley also was not responsible for the paperwork associated with walking an employee out.[28] Though Mr. Finley was a signatory, the Supervisors took possession of and delivered the paperwork to HR.56[29] Glanton himself handled many such walkouts and understood it to be the supervisor's responsibility.[30] Finally, Supervisor Glanton testified that Manager Finley did not have responsibility for deactivating badges, as this was HR's role.[31]

On March 24, 2020, Faith Sheppard went to search for Bobby Clark, not Bert Finley.[32] Supervisor Glanton was with Finley when Sheppard came shouting

---

[24] Glanton Dec. para. 10 JA 586, Tracey Dec. para. 6 JA 589

[25] Id.

[26] Id.

[27] Clark Depo, 95: 3-16 JA 525

[28] Glanton Dec. para. 10 JA 586, Tracey Dec. para. 6 JA 589

[29] Id.

[30] Glanton Dec. para. 10 JA 586

[31] Id.

[32] Id.

loudly, "I need Bobby Clark."[33] When Finley asked if he could help her, Ms. Sheppard proclaimed "no, I just need Bobby!"[34] Glanton verified that Sheppard and Finley had no other conversation before Finley left the floor.[6235] That Sheppard was looking for Clark makes sense not just because Clark would and could not assign walkout duties to Finley, but because as Tracey testified, Clark specifically said he would walk out Gaines when she returned:

> On March 12, 2020, I was with Bert Finley at the Plant when Mr. Bobby Clark came up and said he had employee terminations to do and he had completed three out of four. Clark said he had not completed the fourth because the employee was not present that day but that he would take care of it when she came back.[36]

Had Finley ever actually made the assertions in HR that he had walked Gaines out or deactivated her badge previously, HR would have been looking for Finley, not Clark, on the 24th when Gaines showed up to work with her deactivated badge.

### 1. *Kraft Heinz Did Not Meet Even The Basic Requirements For a Credible Investigation*

There is no witness statement from Clark nor contemporaneous notes from anyone reflecting what was actually said, by whom, and in real-time. Wilson claims in her declaration that she reviewed Finley's March 24, 2020 recording

[33] Id.

[34] Id.

[35] Glanton directly contradicts Sheppard's statement as to the conversation she claims to have had with Finley in the hallway. Glanton Dec. para. 8 JA 586.

[36] Tracey Dec. para. 5 JA 588-589

stating "I just turned it- turned the paperwork in" and she thought that constituted an "admission" that Finley had submitted Gaines' termination form to the Human Resources office.[37] Wilson heard the March 24, 2020 recording for this litigation, yet makes no mention of the fact Finley specifically told her and Harp at the outset of the March 24, 2020 conversation that he did not remember submitting the form, and he did not know if he or Clark had submitted the form in question. Wilson makes no mention that Finley unequivocally denied walking Gaines out, and denied telling anyone that he took Gaines' badge.[38]

It was not reasonable for Harp or Wilson to conclude that Finley was dishonest when they were privy to the biases of the parties involved.[39] The "HR investigation report" was not issued until a month after Finley had been suspended, yet the termination was pre-determined as of 10:44AM on March 24, 2020 via HR Director Longerbeam's texts to Harp:

> [Longerbeam] my thought - you and Lauwana talk to him today to get an understanding from him on what happened. Sounds like dishonesty - saying he walked the employee out but didn't, termed for attendance or AWOL - doesn't seem honest and upfront. Suspend pending review?" [Harp responds:] "that's what I was thinking".[40]

---

[37] Wilson Dec. para. 5 JA 386

[38] Finley Dec. Ex. 2 JA 574-582

[39] Finley Depo, 416: 6-12 JA 501

[40] Longerbeam Dec. para. 10 JA 370

(Emphasis added).[41] Additionally, it was well known that Perry and Sheppard were friends with the target of the investigation Bobby Clark.[42]

By the time HR issued the April 29th Report, Kraft Heinz had recanted on even alleging Finley told Perry he had "walked her out" and instead changed the “dishonesty” offense from lying about walking her out --to now claiming Finley said he "suspended her".[43] Yet, there had never been any discussion about "suspending" Gaines, which is purely an HR function.

In the April 29, 2020 Report HR then decided not to specify (as the Harp and Longerbeam texts did on March 24) that Finley was terminated for "dishonesty" or lying to Perry, but instead states a very different "finding" that Finley was "inconsistent" with her.[44] HR also backed off on claiming Sheppard had witnessed Finley saying Finley had "walked her out", changing it now to “being involved”:

> Findings: Bert's recollection is inconsistent with Myah's. Faith's statement validates Myah's conversation that Bert claimed being involved with Yolanda's termination. Recommendation: Term Bert for Code of Conduct violation- Lack of Integrity/Dishonesty.[45]

---

[41] Other than animosity toward Finley for his persistent safety dissent, there was never any question raised about his integrity. There is no factual predicate in the record for this instantaneous impugning of his honesty ever before the investigation began.

[42] Glanton Dec. para. 13 JA 587

[43] Harp Depo. JA 273, Harp Ex. 6 JA 285-287

[44] Harp Ex. 6 Doc. 50-2, p. 100 and 153 JA 287

[45] Id.

Sheppard's handwritten statement specifically ended stating that she did not know if Finley told Perry he walked Gaines out:

> Bert stated that he had deactivated her badge Thursday and he didn't know she had been here. Bert stated I did that Thursday. *I'm not sure if he was talking about doing the badge or walking her out.*[46]

Kraft Heinz' November 16, 2020 letter to OSHA does not discuss the written statement of Sheppard or claim that she heard Finley tell Perry he had "walked her out", but only references an unspecified "inconsistent account" as with the HR Report:

> Based on these interviews, Wilson and Harp deemed *Finley's account inconsistent with Perry*'s. Finley asked Wilson to speak with another HR Associate, Faith Sheppard, but *Sheppard's recollection corroborated Perry*'s.[47]

Kraft Heinz did not assert to OSHA that Finley was terminated for having lied about "walking her out", instead stating only: "HR affirmed the deactivation, and noted that Gaines was supposed to have been *suspended* over a week prior."[48]

Additionally, the HR "investigation" was intertwined with Finley's objection to terminating a blast attendant on grounds of understaffing per his audio transcript:

[46] Motion, Ahmet Dec., Ex. H (Wilson Depo), Wilson Ex. 4 [Doc 50-2 143/153]. (JA 404) [Wilson Ex. 4 JA 348]. Of course, Bobby Clark was present on March 12 and was walking people out on Thursday the 12th, not Finley.

[47] Ayers Dec., Ex. 7, p. 8 (JA 466)

[48] Ayers Dec., ex.7, p. 7 JA 465.

> MR. HARP: Do you remember -- I know, but that day do you remember going in and out of the HR office a lot? They mentioned that you're in there but it was a little more frequent and it was about the blast attendant, it was about these terms, it was about…
>
> ***
>
> MR. FINLEY: See I forgot about there even being – about the blast. I went in there. Yeah. I did talk about that, about the blast attendant. I don't know what day it was, but I talked to Myah about that that we shouldn't be terming her because we need the blast attendant and then that's when she and then that's when she said that y'all -- to get together. You remember I came back and talked to you about that --. [49]

That "related to" his safety concerns, and the HR Report, OSHA letter, and Motion omit any reference to this, despite the blast attendant termination having been brought up by Harp as important circumstantial evidence as to why Finley was in HR so much on March 12, the same date they claimed he turned in the termination forms.

### 2. *The Shifting Reasons for the Termination of Finley Provide Pretext*

> In the investigation report summary in the heading "Reason for Term":
>
> Both from the start of the issue with Myah and through the investigation which was conducted by Lauwana Wilson (Associate HR Manager) and Josh Harp (Manufacturing Manager) *** *failed to take any accountability for the situation* ***.[50]

This was later elaborated upon in the OSHA letter:

[49] Finley Dec. Ex. 2 JA 581

[50] Harp Depo. Ex. 6 JA 286-287

> However, in March 2020, Finley's *failure to effectively manage staff* resulted in one of them, Yolanda Gaines, working well past the date on which she was supposed to have been terminated.
>
> ***
>
> Finley's failure to notice that Gaines had been at work for over a week after she was supposed to have been terminated reflected ongoing deficiencies managing staff, but Wilson and Harp agreed that mistake alone did not warrant termination.[51]

This means that performance unequivocally was considered as a grounds for termination, but that they needed something more.

### C. <u>Finley Was Treated Much Worse Than Any Other Comparator</u>

Myah Perry's asserted in her email write-up of the situation that Ms. Pam (Security) should have her assignment ended "due to dishonesty and the risk that she placed everyone in by not following the process for allowing employees into the facility."[7752] Perry also recommended that she "[coach] Bobby on effective communication and conflict resolution."[53]

Yet, Supervisor Bobby Clark was Yolanda Gaines' direct supervisor.[54] Clark was the supervisor who actually worked on the Plant production floor, overseeing the bacon lines on the first shift.[55] Clark knew and would have physically seen

---

[51] OSHA letter - KHC response to Finley complaint JA 465-466.

[52] Wilson Depo. Ex. 4 JA 344

[53] Wilson Depo. Ex. 4 JA 345

[54] Clark Dec., Ex. A Form 255 JA 367

[55] Finley Dec. Para. 63 JA 559-60

Gaines each and every day that she reported to work.[56] Yet, Clark testified that he was not disciplined, coached, or counseled in any way as a result of his actions or lack of action in his handling of Gaines' termination:

> *** Q. …Have you ever been disciplined at Kraft Heinz? A. Not to my knowledge I haven't.[57]

He did not even receive an admonition for not reporting Gaines' appearance at work day after day after Clark was aware she was to be walked out. Finally, Kraft Heinz has ignored big HR personnel failings that they have never addressed. According to the HR representatives, the Form 255 for Gaines sat in the HR office for almost two weeks with no entries as to badge collection or deactivation.[58] Though no HR rep filled out their portions, nor took any action on the document whatsoever for almost two weeks, no one in HR was counseled for that failure or lapse.

---

[56] Clark was at work all of the following week after March 12. Finley Declaration, Para. 63. Id.

[57] Clark Depo, 126: 8-13 JA 528

[58] As described in his Declaration, none of the handwriting on the later version of the form other than the signature as the BUM was Finley's. Finley Dec. Para. 77 JA 563

### D. <u>The Investigation of Finley's Retaliation</u>

Kraft Heinz also falsely told OSHA that Finley never raised a safety concern until the OSHA complaint.[59] In its Nov 2020 letter to OSHA, Kraft Heinz claimed:

> Again, *even after he had been terminated, Finley never mentioned food safety* concerns during his post-termination correspondence with the Plant.
>
> ***
>
> Tellingly, in the numerous discussions Finley had with Harp, Wilson, and Longerbeam regarding this investigation *and his termination, Finley never mentioned food safety concerns*.[60]

This is demonstrably false. Not only had he raised the concerns in detail earlier in 2020 and in 2019 to multiple sources as described above, Finley wrote an April 3, 2020 email to the Corporate Director of Human Resources Greg Isbell where he specifically stated he had raised "concerns" and that "nothing happened" with them, including:

> Quality had production to run meat with bone in the meat from mid-February to the 2nd week of March. *** This means that the *X-Rays were not rejecting all of the bad product*.
>
> There is a *risk for* consumer complaints or *product recalls*. Consumers could have issues with *broken teeth or issues with swallowing bones*.[61]

---

[59] Ayers Dec., Ex. 7 OSHA letter - KHC response to Finley complaint JA 439, JA 470.

[60] Id.

[61] Finley Ex. 13 JA 262

Instead of investigating or involving Plant Manager Puckett, Isbell referred the matter back for investigation to Longerbeam, who talked to Finley in April after she had pre-determined Finley was dishonest back on March 24, 2020.[62] Debrick had warned Finley against pushing his concerns, lest he lose his job.[63]

## VI. REPORT OF MAGISTRATE AND DISTRICT COURT ORDER ADOPTING REPORT

### A. Background Facts

The plaintiff testified that prior to his employment with the defendant, he had significant training and experience in process re-engineering and workflow improvement, quality control and assurance, and regulatory compliance. The plaintiff worked for Proctor and Gamble, Co. for eighteen years. In addition, the plaintiff worked for the Kellogg Company for almost five years. [JA 045]

### B. The Plaintiff's Food Safety Complaints

In November 2019, Mr. Harp had concerns with the plaintiff's performance and put together an expectation letter. [JA 47][64] In this letter, Mr. Harp documented several areas that he wanted the plaintiff to make improvements on immediately, including, among other items, labor management, inventory [JA 048] management, improvement plans, time and presence, communication, timeliness of

---

[62] Finley Dec. paras. 92-93 JA 567

[63] Finley Dec. para. 54 JA 556

[64] Plaintiff depo. ex. 7 JA 245-246,[Harp depo. 63:11-17 JA 272.

follow-ups, execution, and knowledge of processes. Also around this time, the plaintiff began critiquing what he "viewed as food safety taking a back seat to production".[65]

The bacon department was short-staffed in the summer of 2019 and that he raised concerns about this to both his production managers and HR on a weekly or even daily basis. [JA 048] If the bacon department did not have the minimum required employees to run a line, the line did not run. Accordingly, the next shift would then be pressured to work twice as hard, and the plaintiff believed that he could not assure food safety under those circumstances. Short-staffing resulted in "not enough eyes on the product passing by on the conveyor line" and that, when this occurred, "the leakers" -- improperly sealed bacon packages-- will threaten food contamination and adulterants such as bone will be sold to consumers". [JA 048] The plaintiff also reported that there were problems with the certification, training, qualification, and experience levels of the available employees.

In addition to the above rendition of the Magistrate, the District Judge wrote that the Plaintiff was concerned that the effect of inadequate staffing was to violate FDCA standards, contending that:

> Less than optimal or full staffing is not in itself illegal, but when non-electronic human surveillance is a key food safety protocol then short staffing-- leaving not enough eyes on the product passing by on the

[65] Plaintiff decl. ¶ 44, JA 553-554

> conveyor line-- does violate the law because, for example, the leakers will threaten food contamination and adulterants such as bone will be sold to consumers. More problematic is the certification, training, qualification and experience levels of the available employees, not just a roster count.

[JA 070].[66] The District Judge also found that Plaintiff complained that the x-ray machines were not being used properly and had not been properly calibrated and that the Quality Department had failed to ensure that employees were properly trained on use of the x-ray machines. The District Judge quote Marquis Glanton, a supervisor at the plant, he went with Plaintiff to "tell Quality that there were too many bones in the meat to safely run [the production line]." [JA 070]. Glanton shared Plaintiff's belief that "[t]he safety culture at the Kraft Heinz Newberry Plant [was] not good," and indicated "[e]mployees fear and expect to be fired if they push food safety issues [and] I shared that fear." *Id.* The Court also noted that Cumeico Debrick ("Debrick"), an area production manager for Defendant, similarly "supported [Plaintiff's] food safety concerns" but "was scared to escalate them further." Id.[67]

Returning to the Magistrate's recitation, he found that knowledge of Plaintiff's protected activities was shared by Mr. Harp and Lauwana Wilson ("Ms. Wilson"), an HR business partner for the defendant, recalled discussing staffing

---

[66] Citing Finley Dec. at 11, JA 549.

[67] Citing Debrick Dec. JA 458.

efforts with the plaintiff. [JA 048]. The plaintiff submitted a complaint in mid-February 2020 insisting on discarding bacon with bone in it to offal, but Debrick testified that the defendant decided to "run the product," and the plaintiff disagreed with this decision. [JA 049].[68] Debrick stated that the plaintiff would "go into our meetings and go back and forth, saying - - like throughout the entire day, [he] would grab packages off the bacon line and bring them into the office and open them up and, you know, show all the bone fragments that were in the bacon". *Id.*

The Magistrate recounted that the quality department was supposed to validate the x-ray machines, ensure that everyone was trained, calibrate the cards, and remove the bypass keys to the machines, but the quality department had not done so. [JA 050]. The Magistrate quoted Debrick stating that "[t]hough I supported [the plaintiff's] food safety concerns, I was scared to escalate them further".[69] Mr. Glanton, the Magistrate noted, similarly testified that "[t]he safety culture at the Kraft Heinz Newberry Plant is not good. Employees fear and expect to be fired if they push food safety issues. I shared that fear".[70]

---

[68] Citing Debrick depo. 34:11-36:13, JA 502-504.

[69] Id., citing Debrick decl. ¶ 12, JA 458.

[70] Id, citing Glanton decl. ¶ 14, JA 587.

**C. <u>Termination of Hourly Workers Gaines</u>**

The District Judge found that on March 12, 2020, Bobby Clark ("Clark"), bacon production supervisor under Plaintiff, was supposed to terminate Ms. Gaines, an hourly worker, for excessive absences. [JA 070].[71] The District Judge did not mention that Clark was tasked with removing *four* workers that day, not just Gaines, and erroneously found that Plaintiff was co-assigned this responsibility, though elsewhere his decision notes evidence contradicting such co-responsibility. (Id, see infra.) When Gaines failed to appear for work that day, however, "they" were unable to do so. *Id*. (No evidence describes such a joint endeavor.) Nonetheless, according to Myah Perry ("Perry"), employed by Defendant as an HR generalist, Plaintiff went ahead and submitted to HR the termination paperwork for Gaines indicating that Plaintiff had walked Gaines out of the building on March 12. Both Plaintiff and Clark signed the termination paperwork. [JA 070].[72]

**D. <u>The Plaintiff's Employment Termination</u>**

The Magistrate noted that Myah Perry ("Ms. Perry"), an HR generalist, asserted that the plaintiff turned in termination paperwork to HR on March 12,

---

[71] Citing Finley Investigation Summary Report, JA 286, and Finley Investigation Summary Report, JA 346.

[72] Citing Finley Investigation Summary Report, JA 286, and Finley Investigation Summary Report, JA 346.

2020, for a production employee, Yolanda Gaines ("Ms. Gaines"), which indicated that the plaintiff had walked Ms. Gaines out of the building on that date. [JA 052].[73] Clark made the certification. Perry documented that Clark stated that on March 12, 2020, he planned to terminate the employment of *four individuals*, one being Ms. Gaines, for exceeding the number of absences allowed. Clark stated that he walked three of the four employees out of the building, but Ms. Gaines was absent that day. The Magistrate reported that Clark claimed that he then told the plaintiff that he was going to be on vacation the following day and that the plaintiff would have to inform Ms. Gaines of her employment termination and walk her out of the building.

At some point Perry documented that the plaintiff stated more than once that he walked Ms. Gaines out of the building on March 12, 2020. [JA 052] However, the Magistrate noted that Perry was confused on some aspects of her account, stating "I'm not sure if he was talking about doing the badge or walking her out".[74] Later in the day Perry informed Ms. Wilson, Mr. Harp, and Ms. Longerbeam about what transpired with Ms. Gaines, Clark and Plaintiff.

---

[73] Citing Wilson depo. ex. 4, JA 344-345, and Perry depo. 38:7-16, JA 357]. Later, infra, the Magistrate noted that Plaintiff disputed the paperwork indicating anything beyond that Clark gave it to him for perfunctory supervisory sign-off.

[74] Citing Wilson depo. ex. 4, JA 348.

The District Judge found that Plaintiff repeatedly contested Perry's account and attributions to him. In contrast to his conversation with Perry, Plaintiff told Wilson that *he had not walked Gaines out* because she had not been at work. [JA 072].[75] Plaintiff stated that "[Gaines] showed up at work and that [Clark] walked her out." *Id*. Then, *according to HR's report*, in a second conversation with Harp and Wilson, Plaintiff indicated that he prepared the termination forms but Clark, not Plaintiff, had walked out the terminated employees. *Id*.[76] Plaintiff recorded this second conversation with Harp and Wilson and the transcript shows that Plaintiff indicated multiple times that he did not know who submitted Gaines' termination forms and denied ever stating that he had walked Gaines out.

The Magistrate and District Judge acknowledged that from the start that morning, before the HR investigation of Plaintiff had commenced, that Mr. Harp and Ms. Longerbeam disparaged him as likely lying and deserving to be removed from the site. They exchanged instant messages on this date, quoted by the Magistrate [JA 52] as follows:

> [Longerbeam] *** Sounds like dishonesty - saying he walked the employee out but didn't, termed for attendance or AWOL - doesn't seem honest and upfront. Suspend pending review? [Mr. Harp:] that's what I was thinking[.]

[75] Citing Wilson Depo. ex. 4, JA 346.

[76] Citing Wilson Depo. ex. 4, JA 347.

The Magistrate noted that it was not until "later that day" that Wilson followed up on Perry's investigation. [JA 52].[77] In the Plaintiff's secret recording, the Magistrate noted that plaintiff stated, "I did not talk to that woman. I just turned it - - turned the paperwork in. I did not talk to that woman at all".[JA 53'

Clark had no authority to assign his walking-out duties to Plaintiff. The Magistrate found that Clark testified that he could not make that assignment because the plaintiff was his boss. Instead, Clark asserted that if he was absent and an employee needed to be walked out, this task "goes to . . . my boss". [JA 53]

## VII. THE MAGISTRATE AND DISTRICT JUDGE WEIGHED ALL EVIDENCE AND GAVE EVERY FAVORABLE INFERENCE TO THE DEFENDANT.

### A. <u>Close Temporal Proximity:</u>

The Magistrate and District Judge found that "there is undoubtedly close temporal proximity between the plaintiff's complaints and his employment termination." Specifically, the plaintiff's latest complaints occurred in February 2020, and his employment was terminated in or around late March 2020. [JA 058]

### B. <u>Company Statistic on Punishing "Dishonesty":</u>

Providing no details whatsoever, the Magistrate and District Judge gave great weight, without any reservation, crediting Longerbeam's declaration that the

---

[77] Citing Wilson depo. ex. 4, JA 340, 344-346.

defendant consistently terminates employees "for dishonesty" in accordance with this policy and that, since 2017, the defendant terminated the employment of seven managers "for dishonesty" and 93 hourly employees "for falsification" at the Newberry plant. [JA 054].[78] Citing no other factors, the court accepted as an indisputable fact that "Wilson concluded that the plaintiff was being dishonest in violation of the code of conduct in the plant handbook" and "ultimately recommended that the plaintiff's employment be terminated". [JA 54]. Longerbeam concurred and Mr. Puckett approved the recommendation. *Id.*

The Magistrate concluded that Ms. Wilson determined that the plaintiff had been dishonest in violation of the code of conduct and recommended that his employment be terminated. [JA 059]. Based on the foregoing, the Magistrate found that the "plaintiff's conduct during the defendant's investigation of Ms. Gaines' employment termination constitutes a legitimate intervening event that severed any causal connection."

### C. <u>Some Evidence of Dishonesty is Enough:</u>

Equally dismissive, the Magistrate found there "is also evidence in the record supporting the defendant's assertion that it terminated the plaintiff's employment based on dishonesty." [JA 059]. That was the Magistrate's standard, so long as there was some "evidence in the record" supporting defendant's assertions,

---

[78] Citing Longerbeam decl. ¶ 6, JA 370.

they were adopted-- every single one of them. Thus, the Magistrate concluded that there "is also evidence that the defendant had recently terminated the employment of numerous individuals at the Newberry plant based on dishonesty or falsification." Id. Without any explanation for his view of potential jurors, the Magistrate concluded as a matter of law "that no reasonable juror could conclude that the plaintiff's complaints about food safety were a contributing factor in his employment termination." [JA 059].

**D. <u>Criticisms of the Investigation:</u>**

All of Plaintiff's criticism of the investigation were similarly rejected, each one explained away in the light most favorable to defendant. The Magisrate discussed Plaintiff's challenge that the HR investigation report was not issued until a month after he was suspended. The Magisrated explained that away because "Wilson testified in her deposition that she finished the report 'a couple of days after . . . the Yolanda Gaines incident'." As noted by the defendant, the Magistrate said, it appears that the date that the plaintiff is referring to is simply when Ms. Longerbeam emailed a copy of that report to her supervisor, Greg Isbell. Ms. Longerbeam explained in her deposition that Mr. Isbell had been contacted on an issue related to the plaintiff's employment termination, "so he reached out to her". [JA 060]. Accordingly, the Magistrate said, Ms. Longerbeam "simply emailed Mr. Isbell the report on that date to provide him with 'more of the documentation and

details surrounding [the plaintiff's] termination'." Ignored was that Plaintiff after being suspended cited his protected activity as being a factor in the conclusions made against him.

Despite the haphazard nature, poor notetaking, abuse of Plaintiff by Clark during an interview, HR ignoring its own buggling of the entire Gaines matter, the Magistrate without mentioning any of this concluded that "there is evidence that the defendant's investigation was reasonably thorough." [JA 061]. Instead of considering it as possible haste to eject the whistleblower, the Magistrate viewed how quickly the investigation was opened and closed as an irrefutable indicia of fairness and efficiency. He noted that when Ms. Perry learned that Ms. Gaines had not been walked out of the building on March 12, 2020, "she promptly interviewed Mr. Clark and the plaintiff that day." [JA 061]. Without considering Plaintiff's challenges to the poor quality and gaps in the notes, the Magistrate found no debatable issue could exist because Ms. Perry "documented the events that transpired with Ms. Gaines, as well as the content of her conversations with Mr. Clark and the plaintiff." Simply making any documents was enough. Then without mentioning that they directly invoked Finley's protected activity, or the disparaging text messages about Finley before the investigation had every begun, the Magistrate noted that the "investigation continued". [JA 062] This was Ms. Wilson and Mr. Harp interviewing the plaintiff again on March 24, 2020. Based on those

feature of what the investigation included but not on what it lacked, the Magistrate found that "plaintiff's argument regarding the sufficiency of the investigation reflecting that his complaints were a contributing factor in his employment termination is without merit." [JA 062].

**E. <u>Shifting Explanations for Termination:</u>**

From there, the Magistrate moved on to explain away Finley's challenge that the defendant's reasons for terminating his employment have shifted over time. Those challenges were rejected as mere semantics, not enough for jury to consider. Ms. Longerbeam characterized the plaintiff as dishonest about "suspending" Ms. Gaines, but Ms. Wilson said he was dishonest about "walking [Ms.] Gaines out". Instead of being a flaw in the investigation process and conclusions, the Magistrate concluded "as stated by the defendant", that "suspending" and "walking Ms. Gaines out" in this context "appear to be interchangeable", and their varying use is "immaterial". [JA 062].

As to plaintiff's challenge that the defendant's reasons have changed over time, noting the investigative summary report stated that the plaintiff was terminated for being "inconsistent," rather than for "dishonesty", the Magistrate viewed once again that those "words are interchangeable and do not reflect an inconsistency." [JA 062]. Thus, inconsistent statements and Finley having explained how hard it was to remember such details over a job mishap that was

assigned to Clark and not him, was to the Magistrate, function indistinguishable from lying. And no jury could decide otherwise. As to the shifting explanations over Longerbeam writing in an email that the plaintiff "could not give a consistent account of what he did with this employee" on the one hand, but adding in anew that he had "failed to take any accountability for the situation", the Magistrate saw nothing for a jury to consider. Defendant stated in its position statement to OSHA as follows:

> [The plaintiff's] failure to *effectively manage staff* resulted in one of them, Yolanda Gaines, working well past the date on which she was
>
> [The plaintiff's] *failure to notice that Gaines had been at work* for over a week after she was supposed to have been terminated reflected *ongoing deficiencies managing staff*, but Wilson and Harp agreed that mistake *alone* did not warrant termination.

[JA 063, emphasis added].[79] With surprising disregard for the legal standard governing this case-- contributing factor-- the Magistrate was unmoved by the co-mingling of failures for which Clark and the HR department were just as culpable. He concluded: "these statements are consistent with the defendant's articulated reason of dishonesty", and viewing it in the light most favorable to defendant, every juror would certainly agree that it is enough that management "recognized" that these alleged failures of Finley (and only Finley) "taken alone, did not warrant

---

[79] Citing OSHA letter, JA 465-466.

his employment termination." The argument was dismissed as "without merit". [JA 063].

**F. False Statements to OSHA Investigators:**

The Magistrate found it equally easy to explain away "that the defendant falsely told OSHA in its position statement that the plaintiff never raised a safety concern until the OSHA complaint". First, the Magistrate ignored that Finley during the recorded interview-- during his suspension-- specifically noting his objections to reducing the head count on already understaffed production lines. And second, the Magistrate was unaffected by the fact that Finley had submitted written assertions of poor product safety before he was terminated-- also while suspended. Instead, the Magistrate once again preferred the defendant's assertions that it "recognized in its reply that the position statement was written in reliance on Mr. Harp, Ms. Longerbeam, and Ms. Wilson's recollections". And surely no jury would not readily accept that the false statement was unintentionally false, the truth having "simply later turned up a post-termination email from the plaintiff to Mr. Isbell regarding food safety complaints". [JA 063]. The Magistrate was confident that all reasonable jurors would see that, despite some inconsistencies and history revisions, " the defendant has been *consistent over time* in its reason for terminating the plaintiff's employment." It the averaging of explanations by the defendant that matter. Therefore, the Magistrate, in weighing the evidence, ruled

that he "declines to find that the defendant's articulated reason has shifted over time." [JA 063].

**G. Evidence that Only Plaintiff Was Punished for Widespread Failures:**

As to plaintiff being undoubtedly "treated worse" than Clark, security personnel, and HR, all of whom had blame in the Gaines fiasco, the Magistrate found that this evidence would be filtered out by comparator rules. Clark was Ms. Gaines' direct supervisor but he was never counseled or disciplined. Nor was the "security guard who allowed Ms. Gaines into the building after her badge would not work". The Magistrate did not dispute that the "paperwork regarding Ms. Gaines sat in HR for almost two weeks with no entries as to badge collection or deactivation and that no one in HR was disciplined for this". All this would be irrelevant to a jury because non of those wrongdoers had "engaged in the same conduct that the defendant concluded the plaintiff engaged in - dishonesty." [JA 064]. Accordingly, the Magistrate found that evidence immaterial because it did not pertain to "a valid comparator". [JA 064].

## VIII. STANDARD OF REVIEW

This court reviews *de novo* a grant summary judgment, *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011). The Magistrate's recommendations set forth in the Report have no presumptive weight, and the district court court remained responsible for making a final determination on

summary judgment. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against [Kraft Heinz] and in favor of [Finley]." *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962). "The evidence of [Finley] is to be believed", *Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156, 164 (4th Cir. 1997), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Kraft Heinz shouldered the "burden of demonstrating to the district court that there is no genuine issue of material fact". *Celotex Corp. v. Catret*t, 477 U.S. 317, 325 (1986). And while a "mere scintilla of evidence in support of the plaintiff's position is insufficient", any larger amount no matter how small that a "jury *could* reasonably find for the plaintiff" on any fact proposition is enough. *Anderson at* 252, *Runnebaum, id.* (1986) (emphasis added). Inconsistent and competing inferences are to be resolved in favor of Finley, so long as they meet a bare reasonableness threshold. See, *Columbia Union College v. Clarke*, 159 F.3d 151, 164 (4th Cir. 1998).

The essence of this inquiry is "whether the evidence presents a sufficient *disagreement* to require submission to a jury *or whether it is so one-sided* that one party must prevail." *Anderson v. Liberty Lobby, Inc.*, at 251–52 (1986) (emphasis added). A cardinal rule violated in this case repeatedly is that a court "cannot

weigh the evidence or make credibility determinations”. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016), and *Salley v. Myers*, 971 F.3d 308, 312 (4th Cir. 2020), abrogated on other grounds by *Thompson v. Clark*, 596 U.S. 36 (2022). These rules apply issue by issue, claim by claim, defense by defense.

## IX. SUMMARY OF ARGUMENT

### A. Fact Summary:

Finley consistently raised serious food safety concerns throughout his employment at Kraft Heinz, particularly focusing on issues arising from short-staffing, inadequate training, and malfunctioning equipment. During the summer of 2019, he reported that insufficient staffing led to inadequate monitoring on production lines, increasing the risk of contaminated products reaching consumers (JA 548-549). Specifically, he warned that "the leakers will threaten food contamination and adulterants such as bone will be sold to consumers" (JA 549). These concerns were not isolated incidents but were brought to management's attention on a weekly or even daily basis.

In February 2020, Mr. Finley reported to Project Engineer John Klein and Quality Department employee Waunda Wright that the x-ray machines were not properly calibrated and lacked the necessary test cards to detect foreign materials in the bacon (JA 014). He highlighted that the quality department had failed to

validate the machines, ensure proper training, and remove bypass keys, which were critical steps for detecting contaminants. These persistent and specific complaints demonstrate Mr. Finley's active engagement in protected activities under the Food Safety Modernization Act (FSMA).

Finley's concerns were shared and supported by other employees, underscoring the legitimacy of his complaints and the awareness of management. Area Production Manager Cumeico Debrick testified that she heard Mr. Finley raise issues about short-staffing to both Mr. Harp and HR, and she corroborated his food safety concerns regarding bone fragments in the bacon (JA 457-458, JA 502-504). She stated that although she supported his concerns, she was "scared to escalate them further" due to fear of retaliation (JA 050, JA 456-458). Supervisor Marquis Glanton also confirmed accompanying Mr. Finley to report excessive bones in the meat to the Quality Department, stating, "I accompanied Wilbert to tell Quality that there were too many bones in the meat to safely run it" (JA 585). He further noted that employees feared being fired for pushing food safety issues, indicating a workplace culture that discouraged reporting such concerns (JA 587). These testimonies demonstrate that Mr. Finley's protected activities were known and that there was a general fear among employees about raising food safety issues.

Key decision-makers were aware of Mr. Finley's food safety complaints at the time of his termination. HR Manager Kathryn Longerbeam acknowledged that the plant, including the bacon department, was short-staffed during the relevant period (JA 370). Plant Manager Josh Harp and HR Business Partner Lauwana Wilson both recalled discussing staffing efforts with Mr. Finley, indicating their awareness of his concerns (JA 274-275, JA 329-330). Despite this acknowledgment, management appeared dismissive of the risks posed by these issues, prioritizing production over food safety. This awareness directly connects Mr. Finley's protected activities to the adverse employment action, reinforcing the causal link.

Kraft Heinz provided inconsistent reasons for Mr. Finley's termination, undermining the credibility of their stated rationale and indicating pretext. HR Manager Wilson cited dishonesty regarding "walking Ms. Gaines out" as the reason for termination (JA 344-346), while HR Director Longerbeam referred to dishonesty about "suspending" Ms. Gaines (JA 285). The investigation report ambiguously concluded that Mr. Finley was terminated for being "inconsistent," rather than explicitly for dishonesty (JA 063). Additionally, in their response to OSHA, Kraft Heinz attributed Mr. Finley's termination to "ongoing deficiencies managing staff," but acknowledged that this alone did not warrant termination (JA 465-466). These discrepancies suggest that the company's explanations were not

genuine but rather fabricated to justify terminating Mr. Finley in retaliation for his food safety complaints.

Testimonies from Mr. Finley and Supervisor Bobby Clark challenge the validity of the company's claim that Mr. Finley was dishonest during the investigation. Mr. Finley consistently denied walking Ms. Gaines out or telling anyone that he had done so, stating, "I did not talk to that woman. I just turned it—turned the paperwork in. I did not talk to that woman at all" (JA 577). Mr. Clark testified that he could not have assigned Mr. Finley to walk Ms. Gaines out because Mr. Finley was his superior, explaining, "I can't assign him to walk anybody out. He was my boss" (JA 525). This directly contradicts the company's assertion that Mr. Finley was responsible for walking Ms. Gaines out and suggests that the accusation of dishonesty was unfounded.

Furthermore, the investigation conducted by Ms. Wilson and Mr. Harp appeared biased and inadequate. Mr. Finley was interviewed multiple times on the same day without being given a clear explanation of the accusations against him (JA 344-346). The investigation heavily relied on accounts from individuals who were close friends with Mr. Clark, such as Ms. Perry and Ms. Sheppard, potentially compromising their objectivity (JA 399, JA 587). The lack of a thorough and impartial investigation indicates that the alleged dishonesty was a pretext for retaliation.

Mr. Clark, who was directly responsible for handling Ms. Gaines' termination, failed to walk her out and did not notice that she continued working for almost two weeks after her scheduled termination (JA 403). Despite this significant oversight, Mr. Clark was not disciplined or counseled (JA 064). Additionally, HR personnel who mishandled Ms. Gaines' termination paperwork and allowed it to sit unprocessed were not held accountable (JA 403-404). The security guard who permitted Ms. Gaines to enter the building after her badge was deactivated also faced no repercussions (JA 403). The fact that only Mr. Finley was punished in connection with the Gaines incident suggests that Kraft Heinz singled him out due to his protected activities.

**B. <u>Argument Summary:</u>**

In this case the inquiry is tightly focused on "contributing factor"-- whether a jury could decide from Finley's evidence that temporal proximity is enough, alone or in combination with the undisputed facts that (a) Finley pressed the company hard on its safety violations which was met with disfavor in a company where employees feared whistleblowing; (b) immediately before the investigation began two officials prejudged that Finley was "dishonest" and should immediately be "suspended" pending a larger investigation, despite him having no history of dishonesty; (c) a deciding official brought up Finley's protected activity (secretly recorded) during his investigation interview; (d) other involved employees faced

no discipline whatsoever; and (e) Kraft Heinz filed a false report with OSHA investigators stating the Finley had never raised safety concerns during the investigation before he was terminated. The summary judgment issue is whether a jury *could* by this evidence individually or in combination make the instructed *de minimis* finding of fact that Finley's protected activity played at least *some small part* in the termination decision. Finley's case in chief required nothing more than that factual conclusion.

On summary judgment, the court cannot discard evidence for all purposes even if it is insufficient for one purpose. Evidence that is not enough to show a disputed issue of pretext or disparate treatment may still be admissible to show animus, incompetence, or unreliability of testimony. "Evidence is relevant if (a) it has any tendency to make *a fact* more or less probable than it would be without the evidence; and (b) the fact is *of consequence* in determining the action." Fed. R. Evid. 401. "These evidentiary relevance 'principles apply to summary judgment motions'." *Ziskie v. Mineta,* 547 F.3d 220, 225 (4th Cir.2008) (citing Rule 401.) Thus, "when the parties submit admissible evidence *on the issue in question* under a summary judgment motion, the court can determine that a trial is unnecessary only if *** the dispute is of no consequence *to the dispositive question*." *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315–16 (4th Cir. 1993), holding modified on other grounds by *Stokes v. Westinghouse Savannah River Co*., 206 F.3d 420 (4th

Cir. 2000). That the evidence is not dispositive on one "issue" or "question" doesn't render it so on a different issue or question. A "party may support its position on summary judgment by citing to *almost any material in the record*, ***[that can] be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2), and *Whittaker v. Morgan State Univ.,* 524 F. App'x 58, 60 (4th Cir. 2013) (emphasis added). A jury would be free to consider any and all relevant evidence to contextualize the very easy to reach "contributing factor" determination, and its subparts.

## ARGUMENT

### X. TIME PROXIMITY ALONE MET FINLEY'S CONTRIBUTING FACTOR BURDEN

Despite Plaintiff's citation of *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) recognizing that "a two-and-a-half month gap between protected activity and an adverse employment action [i]s sufficiently narrow to establish the causation prong of the prima facie case *solely on the basis of temporal proximity*" (emphasis added), neither the Magistrate nor District Judge would cite it, much less discuss it. Instead, the District Judge simply acknowledged that the "magistrate judge recognized that '[t]emporal proximity between the protected activity and the adverse action is a *significant factor* in considering a circumstantial showing of causation'." [JA 075]. But "solely on the basis of temporal proximity"

is strongly stated rule, and is not merely a "*significant factor* in considering a circumstantial showing of causation'."

That temporal proximity alone may be sufficient for a prima facie case has been increasingly embraced by this court. *Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024) ("as we have explained, a plaintiff may demonstrate causation by temporal proximity, **or** by the existence of facts that suggest that the adverse action occurred because of the protected activity, **or** by a combination of the two." *(*Citing *Roberts v. Glenn Indus. Grp., Inc.,* 998 F.3d 111, 123 (4th Cir. 2021), emphasis added, internal quotations and bracket omitted). And longer time gaps can be joined by "intervening events [that] bridge what would otherwise be a prohibitively long temporal gap." *Barbour v. Garland, id. As held by the Supreme Court in Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), absent other facts, temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be "very close" to establish the causation prong). Conceptually, time proximity can be less close if only contributing factor not a "causation prong" is at issue. See also, *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

The District Judge recounted that "the magistrate judge noted that '[t]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event'." [JA 075]. The "passage of a significant

amount of time" qualifier is factually inapplicable, and the "intervening event" qualifier may be relevant to a Title VII prima facie causation and intent case, but not to a contributing factor non-intent, non-causation case.

## XI. INTENT AND CAUSATION ARE NOT BURDENS ON FINLEY

### A. <u>Only FMSA Statutory Standards Apply, Not from Title VII or Common Law</u>

The Magistrate decided that "[a]lthough there are no cases within the Court of Appeals for the Fourth Circuit substantively addressing a retaliation claim under the FSMA" 21 U.S.C. § 399d(a)(1), he found "persuasive, and the parties here agree that, in accordance with those cases, a prima facie case of retaliation" can look to, inter alia, "the Sarbanes-Oxley Act ("SOX")", as the courts did in *Byron v. Inst. for Env't Health, Inc*., 428 F.Supp.3d 467, 471 (W.D. Wash. Dec. 19, 2019) and *Chase v. Bros. Int'l Food Corp*., 3 F.Supp.3d 49, 53 (W.D.N.Y. 2014), the Magistrate favorably citing both of those FMSA cases.[JA 056]. The Magistrate found that "even assuming that the plaintiff's complaints were protected activity under the FSMA, he has failed to show the third element of a prima facie case - that a reasonable jury could conclude that his protected activity was a contributing factor in his employment termination."

Despite the Magistrate finding that in-circuit SOX cases and FMSA out-of-circuit cases would be applied to this case, the District Judge applied a *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) standard: "Assuming Plaintiff

“makes this prima facie showing, . . . [Defendant] bears the burden of *offering a nondiscriminatory explanation* for its decision to terminate [Plaintiff’s] employment, and, thereafter, the *burden would return to [Plaintiff]* to show that [Defendant’s] proffered explanation is pretext for [FSMA] retaliation”, citing *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). [JA 074-75]. This standard is contrary to the FMSA on its face, and need not be discussed further.

The Magistrate correctly recited that a "contributing factor is any factor, which alone or in combination with other factors, *tends* to *affect in any way* the outcome of the decision." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (emphasis added). Because this is not a requirement of causation, but only of a tendency to *affect in any way*, contributing factor "is broad and forgiving, and [t]his test is specifically intended to overrule existing case law, which requires a whistleblower *to prove* that his protected conduct was a *significant, motivating, substantial, or predominant factor* in a personnel action". Id. (internal citations and quotation marks omitted). "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation . . . ." Id. (citation omitted).

**B. <u>Murray v. UBS (2024) Has Abrogated the District Court Judgment:</u>**

"Motivation" and "intent", which are the foundational to "but for" causation, is not required for contributing factor, although a showing of *any causation* at all would per se meet contributing factor. That is now explicit under a case post-dating all proceedings below: *Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024). This includes the Magistrates reliance upon *Barrick v. Pngi Charles Town Gaming, LLC*, 799 F. App'x 188, 189-90 (4th Cir. 2020) (violation of personal relationship policy was a "legitimate intervening event" that severed any "*causal connection*" to termination"), which is now inconsistent with *Murray v. UBS.* (Emphasis added).

Similarly, now inapplicable under *Murray v. UBS* is a "disparate treatment" claim based on "comparators". Disparate treatment is conceptually unrelated to contributing factor analysis. Had *Murray v. UBS's* abrogation of intent, motive and causation been the law at the time of district court briefing, Plaintiff would not have invoke disparate treatment. The Magistrate cited *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223-34 (4th Cir. 2019) (plaintiff must produce evidence comparator conduct under Title VII), and *Greenup v. CSX Transp., Inc.*, 2019 WL 3464632, at *2 (D. Md. July 31, 2019) (applying Title VII comparator law in the FRSA context). [JA 064-65]. These cases would be relevant to rebutting the employer's clear and convincing legitimate reasons same action defense, but not to contributing factor. Indeed, in footnote 4, the Magistrate stated without any

further analysis that he "would find, in the alternative, that the defendant has shown by clear and convincing evidence that it would have terminated the plaintiff's employment in the absence of his complaints." This footnote is yet another instance in which the Magistrate departed from summary judgment standards showing obvious favorable inclination to defendant.

### C. **Once Established Contributing Factor Cannot be Un-established**

Relying upon the *causation-based defense* of legitimate reason for discharge, the Magistrate concluded that the *non-causation contributing factor* element had been negated. Notwithstanding that the FMSA requires that particular causation defense to be proven by clear and convincing evidence, the district court decided that it could be used to rebut contributing factor. The two are not logically related or dependent.

That the employer can point to its own factors for termination does not negate the whistleblower's evidence of contributing factor. For example, if Kraft Heinz took Finley's protected short staffing complaints into account (as it did in the recorded Finely interview), that short staffing complaint would necessarily be a jury's decision under the contributing factor instruction. All information expressly referenced by company officials in the immediate context of the adverse action decision process necessarily allows jurors to decide that the content or making of that complaint more probably than not "tended" to "affect" the decision in some

indeterminate way. Logically, that Kraft Heinz introduces evidence that other later-occurring factors *also affected* the decision does not negate earlier-occurring factors. The statute presumes that many factors may likely tend to affect the decision, but so long as one very small one is in that mix, contributing factor is established.

Once established, contributing factor cannot be un-established. The statute prescribes not just comparative proof standards for the parties, it prescribes a rigid order of proofs, which then trigger next steps. That order is first determine if protected activity tended in any way to affect the decision. If it did, then the statute prescribes the next step which is a highly structured affirmative defense. That affirmative defense is not to be conflated with contributing factor. Thus, if close time proximity can establish contributing factor, that cannot be un-established by a causation-based "intervening event", or more accurately, an "intervening cause". Nor can the employer's "good faith belief" in its legitimate reasons defense. If the later occurring factor is an asserted legitimate reason for discharge, the statute singles that one out as an affirmative defense requiring the high proof standard known to the civil law.

### D. <u>The Magistrate Conflated the Comparable Burdens of Proof of the Parties</u>

The Magistrate conflated these comparative proof burdens. He wrote that there is "evidence in the record supporting the defendant's assertion that it terminated

the plaintiff's employment based on dishonesty." [JA 059]. Instead of viewing the evidence as plaintiff argued as proof of bias and prejudgment, the Magistrate viewed it favorably to Kraft Heinz as showing the company's total and timeless "good faith" belief in its intervening causation defense. The sin of bias was thus recast as the virtue of persistence. That is, the Magistrate wrote that "Mr. Harp and Ms. Longerbeam exchanged internal instant messages during this time frame, stating their concerns about the plaintiff being dishonest." Id.

The Magistrate found "that no reasonable juror could conclude that the plaintiff's complaints about food safety were a contributing factor in his employment termination." He based this conclusion on *DeJarnette v. Corning Inc*., 133 F.3d 293, 299 (4th Cir. 1998) ("when an employer *articulates* a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct"), a rationale completely inapplicable to contributing factor analysis.

## XII. THE DISTRICT COURT IMPERMISSIBLY LIMITED THE REACH OF RELEVANT EVIDENCE

Like the Magistrate did in considering relevant and admissible evidence only as applied to defenses and avoidances such as disparate treatment and employer good faith defense, the District Judge similarly gave a narrow lense to evidence regarding shortcomings in Kraft Heinz's investigation. The evidence of that error-laden and poorly documented investigation would be relevant to how the jury

would weigh contributing factor evidence. It would go the reliability of what factors were or were not being considered, including errors of prejudgment of Finley's supposed dishonesty, which of his statements were inconsistent due to lack of memory as opposed to deliberate misrepresentation, what duties had been Clark's and not Finley's, and the secretly recorded invocation of his Finley's protected activity during the investigation interview.

Instead, the District Judge chose to limit that evidence to a pretext analysis. "An employer's investigation process need not have been ideal, but its decision on the evidence adduced must have been 'reasonably informed and considered.'", citing *Burton v. Food Giant Supermarkets, Inc.*, No. 1:19-cv-2445-JDB-JAY, 2021 WL 3574885, at *8 (W.D. Tenn. Aug. 12, 2021); and *Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021) (quoting *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017) for the proposition that the "fact that [Defendant/employer's] investigation may not have been as thorough as [Plaintiff/employee] would have liked does not establish pretext, so long as the investigation was not 'obviously inadequate'." [JA 084-85].

## XIII. THERE IS DISPUTED EVIDENCE AS TO WHETHER KRAFT HEINZ WOULD HAVE TERMINATED FINLEY ABSENT HIS PROTECTED ACTIVITY.

Neither the Magistrate nor the District Judge actually discussed the statutory affirmative same action defense, or what was clear and convincing evidence. But

to be safe, Finley will point out that to win on its clear and convincing affirmative defense, the company must meet a high bar. "Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highlyprobable'." *Price v. Symsek, id.* at 1191(citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1983). See also, *Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 U.S. Dist. LEXIS 2548 (C.D. Cal. Jan. 11, 2011), and *Donnelly Corp. v. Gentex Corp*., 913 F. Supp. 1014, 1020 (W.D. Mich. 1995). This standard "intentionally was designed to be demanding in nature". *Smith v. DOL*, *Id*., citing *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) ("for employers, this is a tough standard, and not by accident.").

## XIV. THIS COURT MUST HOLD DISTRICT COURTS TO THE MANDATES OF MURRAY V UBS

### A. <u>The End of Intent and Causation in Modern Whistleblower Statutes:</u>

*Murray* upends an entire legal tradition in American law. The Court unanimously clarified that under the contributing factor standard, a plaintiff does not need to show intent or causation. Specifically, the Court noted that the ordinary meanings of "contribute" and "factor" suggest a broad interpretation, indicating that showing retaliatory intent is one way to prove that the protected activity was a contributing factor, but it is not the only way. This low burden on the whistleblower, the Court held, must in each case align with the statutory language

prescribed under SOX by incorporating 49 U.S.C.A. § 42121 (b)(2)(B)(i), completely dispensing with any proof of intent.

**B. <u>Murray v. UBS Governs FMSA Cases:</u>**

The FMSA 21 U.S. Code § 399d(b)(2)(C)(iii) sets forth the §42121(b)(2)(B)(i) directly rather than by incorporation, setting forth the order of inquiry, first to determine the existence of a violation-- *which is complete upon a finding of contributing factor*. Then relief for that simple violation must be ordered *unless the employer can meet a rigorous affirmative defense*:

> (iii) Violation standard
>
> The Secretary may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.
>
> (iv) Relief standard
>
> Relief may not be ordered under subparagraph (A) if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

Under the statute, that affirmative defense cannot be used to rebut the existence of a contributing factor, but if it could, then it would still require clear and convincing evidence. To read the statute otherwise do violence to it.

**C. <u>The District Court Did Not Address Finley's Pre-Murray Arguments:</u>**

The District Judge declined to even acknowledge, much less address this

argument made in Plaintiff's Objections to the Magistrate Report. That argument was this at JA 682-83:

> To do so would be to eviscerate the statutory scheme which allows Plaintiff to establish contributing factor by the lowest quantum of evidence known to employment law. On this issue of why an employer took an adverse action, Congress requires that showing upon clear and convincing evidence, the highest quantum of civil evidence. *As a matter of law, it is in gross derogation of the statute to allow an employer to defeat contributing factor on a showing the reasons for the termination, unless that showing is made by clear and convincing evidence*. The employer's evidence of why it terminated the whistleblower cannot properly be considered at all under the contributing factor analysis, for to do so necessarily requires the weighing of the employer's motivation, mixed motives, and significance of the alternate factors the employer posits for the adverse action. *No matter the stage of the statutory analysis, if the court is going to weigh the employer's reasons for an adverse action, the only allowable evidentiary standard is clear and convincing evidence.* To disprove contributing factor based on employer motive, the employer's evidence must be clear and convincing. Here it is not.

(Emphasis added, internal quotations and bracket omitted).

## XV. COURTS MUST RESPECT CONGRESS' DECISION TO ALLOW RELIEF WITHOUT ANIMUS, INTENT OR CAUSATION

The problem that Murray v. UBS seeks to fix is the unrelenting persistence of judges to not let go of common law concepts of intent and causation for any case sounding like tort. This phenomenon was discussed at lenght in *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 695–96 (2011) under the Federal Employers Liability Act, 45 U.S.C. § 51 ("FELA"). The Court explained:

> "Dissatisfied with the railroad's common-law duty," Congress sought to "supplant that duty with FELA's far more drastic duty of paying

> damages for injury or death at work due in whole or in part to the employer's negligence." Rogers, 352 U.S., at 507. Yet, Rogers observed, the Missouri court and other lower courts continued to ignore FELA's "significant" departures from the "ordinary common-law negligence" scheme, to reinsert common-law formulations of causation involving "probabilities," and consequently to "deprive litigants of their right to a jury determination." Aiming to end lower court disregard of congressional purpose, the Rogers Court repeatedly called the "any part" test the "single " inquiry determining causation in FELA cases.

(Emphasis added, internal quotations and brackets omitted.)

Similar problems were created by judges in the context of racial gerrymandering. In *Thornburg v. Gingles*, 478 U.S. 30, 72–74 (1986), the Court ruled that when Congress dispenses with an intent or causation requirement, defenses based on intent or causation are inapplicable. "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants *may not rebut that case with evidence of causation or intent*." (Emphasis added).

## XVI. CONCLUSION

For the reasons set forth above, the district court erred in granting summary judgment to Kraft Heinz on Finley's FSMA retaliation claim. Murray v. UBS requires reversal. The district court failed to view the evidence in the light most favorable to Finley, improperly resolved factual disputes, applied an incorrect causation standard, and failed to properly analyze relevant evidence across the

issues. Accordingly, this Court should reverse the grant of summary judgment and remand the case for trial.

Respectfully submitted,

/s/ Thad M. Guyer

______________________________

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
Attorneys for Appellant Wilbert Finley

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant Wilbert Finley respectfully requests oral argument. This appeal presents important questions regarding the proper application of summary judgment standards in Food Safety Modernization Act retaliation cases, including the Golden Rule of Summary Judgment. Oral argument would assist the Court in addressing the complex factual record and legal issues presented.

## CERTIFICATE OF COMPLIANCE

1. This Opening Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains 12,050 words.

3. I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

Dated: November 4, 2024

/s/ Thad M. Guyer

Thad M. Guyer

## CERTIFICATE OF SERVICE

SERVED **APPELLANT'S OPENING BRIEF** ELECTRONICALLY by ECF and Email on the 4th day of November, 2024 on all counsel of record registered on the Court's ECF service.

/s/ Thad M. Guyer

______________________________

By Thad M. Guyer