No. 24-1191

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

---

**WILBERT FINLEY**

Plaintiff – Appellant,
v.

**KRAFT HEINZ INC.**

Defendant - Appellee
.

---

# CORRECTED REPLY BRIEF OF APPELLANT

ON APPEAL FROM A FINAL JUDGMENT OF THE U.S. DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA
(No. 8:22-cv-426-TMC)

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501

(206) 941-2869
thad@guyerayers.com

Counsel for Appellant

## TABLE OF CONTENTS

I. SUMMARY OF REPLY .......... 5

II. STATEMENT OF THE REBUTTAL FACTS .......... 6

A. Pattern 1: Improper Credibility Characterizations and Determinations .......... 7

B. Pattern 2: Mischaracterization of Protected Activity Evidence .......... 10

C. Pattern 3: Improper Framing and Mischaracterizations of Causation Evidence .......... 14

ARGUMENT .......... 16

III. INTENT AND CAUSATION ARE NOT BURDENS ON FINLEY .......... 16

A. Kraft Heinz Ignores the Holding and Implications of Murray v. UBS .......... 16

B. The Second Circuit Majority's Erroneous End-Run in Murray 2 .......... 18

IV. THERE IS DISPUTED EVIDENCE AS TO WHETHER KRAFT HEINZ WOULD HAVE TERMINATED FINLEY ABSENT HIS PROTECTED ACTIVITY .......... 19

A. Kraft-Heinz's "Second-Guessing the Employer" Contention is the Honest Belief Doctrine by another Name. .......... 19

B. The Honest Belief Doctrine Cannot Apply to Whistleblower Retaliation FSMA Claims .......... 20

V. APPELLANT DID NOT WAIVE THE EMPLOYER'S AFFIRMATIVE DEFENSE ARGUMENT, AND THE COURT SHOULD REMAND IT .......... 22

A. The Waiver Issue Lacks Merit .......... 22

B. Discretionary Nature of Appellate Review Under the Fourth Circuit .......... 22

C. Why Finley's Treatment Surpasses a "Passing Shot" .......... 23

VI. THE AFFIRMATIVE DEFENSE SMITH FACTORS ARE SUFFICIENTLY REFERENCED IN THE OPENING BRIEF .......... 24

A. The District Court's Narrow Analysis and Its Implications .......... 27

B. The District Court's Inadequate Reasoning and the Need for Remand .......... 29

VII. CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE .......... 31

CERTIFICATE OF SERVICE .......... 33

## TABLE OF AUTHORITIES

**Cases**

*Abels v. DISH Network Serv., LLC,* 507 Fed.Appx. 179, 185 (3d Cir.2012)..........20

*Adkins v. CSX Transp., Inc.*, 70 F.4th 785 (4th Cir. 2023)......................................21

*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001)..........................20

*Burton v. Food Giant Supermarkets, Inc.*, No. 1:19-cv-2445-JDB-JAY, 2021 WL 3574885, at *8 (W.D. Tenn. Aug. 12, 2021).....................................................28

*Colorado v. New Mexico,* 467 U.S. 310, 316–17 (1983). ......................................26

*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998),.........................20,29

*Donnelly Corp. v. Gentex Corp.*, 913 F. Supp. 1014, 1020 (W.D. Mich. 1995) .....26

*Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) ........................24

*Feldman v. L. Enf't Assocs. Corp.,* 752 F.3d 339, 350 (4th Cir. 2014)....................20

*Hartzman v. Wells Fargo Advisors, LLC*, No. 1:14CV808, 2017 WL 2982997, at *7 (M.D.N.C. July 12, 2017)..............................................................................19

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) ..8

*Manning v. Caldwell*, 930 F.3d 264, 271 (4th Cir. 2019) ................................23, 30

*Marano v. Dep't of Just.*, 2 F.3d 1137, 1143 (Fed. Cir. 1993) ................................18

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012).............................................................................................................30

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)............................29

*Mercantile Peninsula Bank v. French (In re French),* 499 F.3d 345, 352 (4th Cir.2007) ..............................................................................................................9

*Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024) ......................................................31

*Murray v. UBS*, 128 F.4th 363 (2nd Cir. 2025)........................................................18

*Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021)..........................28

*Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993)..........................................26

*Sharif v. United Airlines, Inc.,* 841 F.3d 199 (4th Cir. 2016)..................................20

*Shipton v. Baltimore Gas & Elec. Co.,* 109 F.4th 701 (4th Cir. 2024) ....................20

*Smith v. Dep't of Lab.*, 674 F. App'x 309, 315–16 (4th Cir. 2017) .........................25

*Stone & Webster Eng'g Corp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir. 1997) .25, 26

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014) ....................8

*United States v. Clay*, 627 F.3d 959, 966 n.2 (4th Cir. 2010)....................23,31

*Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 905 (4th Cir. 2017) ....................28

*Wiest v. Tyco Elecs. Corp.,* 812 F.3d 319, 333 (3d Cir. 2016)....................19

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 U.S. Dist. LEXIS 2548 (C.D. Cal. Jan. 11, 2011) ....................26

**Statutes**

21 U.S.C. § 399d(b)(2)(C)(iii)....................25

49 U.S.C. § 42121(b)(2)(B)(iv) ....................25

**Treatises**

10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 2728 (3d ed.1998) ....................9

## I. SUMMARY OF REPLY

There is genuine, disputed evidence as to whether Kraft Heinz would have terminated Finley absent the contributing factor of his protected activity. The record shows that termination was not indisputably based on alleged dishonesty but was influenced by his protected disclosures and deteriorating relationships with supervisors because of them. Under the Food Safety Modernization Act (FMSA), the employer must prove by clear and convincing evidence that it would have taken the same adverse action absent the protected conduct. This standard is exceptionally high, as demonstrated by the cases cited in Finley's opening brief, including *Price v. Symsek*, *Wireless Warehouse, Inc. v. Boost Mobile, LLC*, *Donnelly Corp. v. Gentex Corp.*, *Stone & Webster Eng'g Corp. v. Herman*, and *Colorado v. New Mexico*. Kraft Heinz's argument that Finley's opening brief ignored and thus waived argument against the affirmative defense is preposterous. Section XIII of the opening brief is labelled: "There Is Disputed Evidence as To Whether Kraft Heinz Would Have Terminated Finley Absent His Protected Activity", (pp. 53–54). Nor does Kraft Heinz deny that the Magistrate and District Judge each found for the company on the affirmative defense in footnotes with no analysis, not even a single reference to the *Smith v. DOL* factors—a case cited in Finley's opening brief.

The evidence regarding Finley's alleged dishonesty is conflicted, the timing and causal influence of his protected disclosures are disputed, and the investigation into Gaines' termination was directly affected by his whistleblowing. Moreover, the District Court and Magistrate improperly limited the scope of relevant evidence by confining their review to a narrow pretext analysis. They failed to consider disputes over whether Finley's inconsistent statements resulted from memory lapses or deliberate misrepresentation, the allocation of duties between him and his supervisors, and the significance of the secretly recorded reference to his protected activity. Additionally, the Magistrate conflated the burdens of proof by treating evidence suggestive of bias as proof of the employer's "good faith" defense. This approach is inconsistent with the clear and convincing evidence standard required by the FMSA and ignores the statutory framework that intentionally imposes a lower burden on whistleblowers. As a result, genuine disputes of material fact remain, and a jury must resolve these issues rather than allowing summary judgment in favor of Kraft Heinz.

## II. STATEMENT OF THE REBUTTAL FACTS

Six key fact manipulation patterns in which Kraft engaged emerged: (1) mischaracterizing inconsistent recollections as deliberate dishonesty; (2) downplaying or ignoring documented food safety concerns; (3) dismissing causation evidence as "speculative" despite sufficient record support; (4)

overstating the thoroughness and objectivity of Kraft's investigation; (5) exaggerating the strength of Kraft's same-action defense; and (6) using pejorative language throughout.[1] Each mischaracterization, when corrected by reference to the actual Joint Appendix evidence, reveals genuine disputes of material fact that should have precluded summary judgment.

### A. Pattern 1: Improper Credibility Characterizations and Determinations

Kraft repeatedly characterizes Finley's testimony as "dishonest," "contradictory," or "inconsistent" in ways that improperly instruct this Court to make credibility determinations reserved exclusively for the final factfinder. Kraft further repeatedly employs language that presupposes Finley's dishonesty, claiming

---

[1] *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (district court impermissibly “credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion; and “neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party”, quoting *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Tolan cautioned district courts:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

"changed his story", engaged in "yet another flip-flop", and made "deceptive excerpts".[2] Each characterization improperly frames a disputed issue of fact as a settled matter of credibility, but witness credibility assessment lies at the heart of the factfinder's role and cannot be usurped through rhetorical characterizations in legal briefs.[3]

Kraft's central accusation—that "Finley was dishonest during HR's investigation"—frames a disputed factual issue as a settled conclusion.[4] The Joint Appendix reveals that while Finley's statements about the Gaines termination evolved during questioning, the record contains genuine disputes about whether these inconsistencies reflected intentional deception (as Kraft attempts to claim) or reasonable confusion about unclear termination procedures, practices and paperwork.[5] By characterizing these inconsistencies as deliberate "dishonesty," Kraft asks this Court to make precisely the type of credibility determination prohibited at summary judgment.

---

[2] Kraft Br., p. 28.

[3] The Fourth Circuit has emphasized that summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." 10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 2728 (3d ed.1998). The court therefore cannot weigh the evidence or make credibility determinations. *Mercantile Peninsula Bank v. French (In re French),* 499 F.3d 345, 352 (4th Cir.2007). *Jacobs* at 568-69.

[4] Kraft Br., p. 5.

[5] JA 343-48.

Kraft characterizes Finley as having "multiple accounts of what happened with this employee."[6] However, the investigation notes show Finley attempting to clarify confusion about termination procedures, not deliberately changing his story. A confusion versus dishonesty determination requires credibility assessment, which is impermissible at summary judgment stage.

Kraft claims Finley "changed his story" when speaking with Wilson.[7] The actual investigation notes show a complicated termination process with mixed communications between HR, Clark, and Finley, not definitive evidence of intentional dishonesty—a factual dispute requiring jury assessment. Kraft alleges Finley "initially said he 'can't remember'... but later said he did" turn in paperwork.[8] However, the recording transcript reveals during questioning Wilson told Finley that Finley had turned in the paperwork, using highly leading questions: "When you turned in the paperwork..."[9] Creating apparent inconsistency through interrogation tactics does not establish actual dishonesty.

Kraft claims “Wilson said Finley's job would not be in jeopardy if he was honest.”[10] However, the transcript reveals Wilson put Finley in jeopardy using leading questions such as 'When you turned in the paperwork, you didn't say you'd

---

[6] Kraft Br., p. 27; citing JA 285.
[7] Kraft Br., p. 7; citing JA 341, 343-48.
[8] Kraft Br., p. 8; citing JA 574, 577.
[9] JA 577.
[10] Kraft Br., p. 8; citing JA 386, 579.

talked to her?' that presumed actions rather than neutrally inquiring about them.[11] This questioning technique could create apparent inconsistencies by suggesting premises that were not established. When Kraft characterizes this exchange as a straightforward offer of leniency, it omits the investigative approach that used leading questions to shape Finley's responses.[12]

Kraft claimed Finley admitted that he has no basis to doubt Wilson's and Harp's stated reason for terminating his employment due to dishonesty, testifying that it was "their opinion, what they thought."[13] In actuality, the full testimony shows Finley testified it "had to be" because of protected activities:

> So why would two days later Josh terminate your employment **because of those protected disclosures** after he just gave you another platform on Monday? A. I don't know what's in his mind. Somebody might have told him to do this. ***. I don't know Lauwana's mind set,***. So that's -- may be **my thoughts it had to be that** ***. Because it was strange. Everything was very, very strange.[14]

This creates a factual dispute requiring jury resolution.

### B. <u>Pattern 2: Mischaracterization of Protected Activity Evidence</u>

Kraft repeatedly mischaracterizes evidence regarding Finley's FSMA protected activity through dismissive language and selective citations, characterizations

---

[11] JA 574-82, at 577.
[12] JA 574-82.
[13] Kraft Br., pp. 34-35; citing JA 217.
[14] JA 239, 432: 25, JA 240, 433: 1-16 (Finley Deposition) (Emphasis added)

meant to undermine the protected activity by portraying his food safety concerns as trivial, insincere, or uncommunicated.

First, for instance, Kraft still falsely claims Finley "said nothing about his alleged food safety concerns" in his April 2020 email to Isbell.[15] But, Finley's email explicitly stated the food safety concerns he had been raising throughout that spring, including concerns over consumer safety and recalls, issues with bone being found in the product, and a lack of qualified x-rays:

> Issue that I was concerned about and nothing happened. Quality had production to run meat with bone in the meat from mid-February to the 2nd week of March. I brought up that the issue to upper leadership that the X-rays on the line were not qualified. **Production did not have the cards** to calibrate the machines at the beginning of each shift. **This means that the X-Rays were not rejecting all of the bad product.** X-Rays were signed off and qualified by quality 2 weeks after we started having the bone issues. **There is a risk for consumer complaints or product recalls**. Consumers could have issues with **broken teeth** or issues with **swallowing bones**.[16]

By characterizing this documented food safety concern as non-existent, Kraft asks the Court to disregard the evidence that is favorable to Finley.

Second, Kraft selectively emphasizes Finley's alleged absolute statements while ignoring his broader food safety concerns; for instance, they claimed Finley 'believes any bacon produced without a functioning x-ray machine violates the law.'[17] This mischaracterizes Finley's testimony, which instead contains both

---

[15] Kraft Br., p. 9.
[16] JA 262-64, at 262 (emphasis added).
[17] Kraft Br., p. 13.

outcome-focused concern: "If bone is going out to the consumer regardless of if you have an x-ray or not, that's a violation of food safety, yes" and equipment-focused concerns about proper implementation of safety controls.[18] If Kraft is relying on the x-rays for instance, instead of visual inspection, which was their intent, then the x-rays especially must work properly.[19]

Kraft then claims Finley "slightly pivoted" with regards to his x-ray concerns in his appeal brief, noting: (1) he reported to Klein and Wright that the x-ray machines were not properly calibrated; (2) that the machines "lacked" test cards; and (3) that Quality failed to ensure training on them.[20] Kraft then attempts to shoo these concerns away with after-the fact explanations, claim the x-rays were calibrated (citing JA 295-296); that Finley just wanted more test cards (citing JA 257, JA 291); and that Finley's team attended training on the x-rays (citing JA 169, JA 295-296). As far as the calibration, Kraft cites Klein's testimony, which only stated the machines received an initial calibration, not that they were calibrated as needed or even functioning properly or checked when Finley raised his concerns. As far as Finley simply "wanting more," Finley's email articulated a safety concern with not having test cards for each of the x-rays machines; sharing cards between lines created inefficient testing but also inconsistency in testing that could

---

[18] JA 229, Finley Depo., 363: 22-24.
[19] JA 309, JA 362.
[20] Kraft Br., p. 13.

compromise safety protocols.[21] Kraft also claims Finley's team attended training on the x-rays, but the cited testimony reveals only *some* employees received training, not that there was comprehensive training for all of the relevant personnel.[22] Additionally, Finley himself did not receive training on the x-rays.[23]

Kraft then ignores verbal protected activity, claiming Finley's "*emails* do not reflect any belief that the bacon should be sent to offal" ignoring Finley's testimony that he verbally told management, "We need to stop and offal all this meat."[24] It also completely ignores Debrick's testimony that she heard Finley telling management they needed to offal the bone laden bacon:

> he wanted to offal the product and then start fresh. It was a lot of product and it was very expensive product, and there was no way that we would have been able to make up the pounds if we would have went ahead and offaled it. So quality determined that we were going to run the product, Bert said no, he didn't want to run the product, and we would go into our meetings and he would go back and forth, saying -- like throughout the entire day, Bert -- Bert would grab packages off the bacon line and bring them into the office and open them up and, you know, show all the bone fragments that were in the bacon, and he'd go into Josh's office...[25]

Kraft's attempts to parse out only the pieces that support their theories, without even acknowledging the wealth of other evidence, in contradiction of summary judgment standards.

---

[21] Kraft Br., p. 13; citing JA 257, 291, email at JA 257.
[22] JA 169.
[23] JA 169.
[24] Kraft Br., p.12, fn. 11; citing JA 248-55, Finley testimony at JA 171-73, 175.
[25] JA 649.

### C. Pattern 3: Improper Framing and Mischaracterizations of Causation Evidence

Kraft also uses dismissive language to characterize Finley's causation evidence as speculative or baseless, improperly framing factual disputes as legal insufficiencies. Under the FSMA's "contributing factor" standard, Finley need only produce evidence that his protected activity was one factor, not the sole factor, that influenced the termination decision.

For instance, Kraft dismisses Finley's retaliation evidence as 'irrelevant whataboutisms.'[26] Yet, Finley presented evidence of differential treatment between him and Clark regarding the same alleged incident—comparator evidence as probative of retaliatory motive.[27] Kraft disregards clear evidence that HR employees and security guards who failed in this incident received no discipline, coaching or counseling whatsoever—speaking to the singling out of whistleblower Finley and the disregard of the import of security and HR's role. Kraft claims "Clark—who provided consistent accounts of his involvement with Gaines' termination—was [not] dishonest."[28].) Clark made false statements and omissions about his role in handling Gaines' termination, and his inconsistencies received no scrutiny, highlighting disparate treatment.

---

[26] Kraft Br., p. 37.
[27] JA 408-409, 672-673, 736.
[28] Kraft Br., p. 43; citing JA 44-66, 348.

Kraft further characterizes Finley's evidence as 'nothing but his 'feeling."[29] However, the record contains substantial concrete evidence beyond mere feelings: Debrick's testimony of witnessing Finley's reports and warning him of retaliation, Finley's documented April 3, 2020 email to Corporate HR Director Greg Isbell specifically stating his concerns about 'meat with bone' and warning of 'consumer complaints or product recalls' due to 'broken teeth or issues with swallowing bones' (JA 262-64, 404, 410); the testimony of co-worker Marquis Glanton confirming he accompanied Finley to 'tell Quality that there were too many bones in the meat to safely run it' (JA 132-33); and the timeline showing Finley's termination shortly after these documented food safety complaints (JA 171-172).

Kraft claims Finley's causation theory "asks the Court to jump a hopscotch of speculation and claimed a "gap" hurt his case."[30] Yet, the evidence shows a temporal proximity of four to six weeks between February 2020 food safety complaints and March 2020 termination—sufficient evidence for a reasonable jury to infer causation.[31]

Kraft claims 'Finley layered subjective opinion upon inference' to conclude retaliation.[32] The full testimony shows Finley describing objective facts, supported

[29] Kraft Br., p. 37.
[30] Kraft Br., p. 35-36, p. 29.
[31] JA 171-72.
[32] Kraft Br., at p. 36; citing JA 195.

by evidence that management had negative reactions to his safety concerns.[33] Debrick testified coworkers heard warnings that 'Bert better slow down before he gets termed, because he wanted to throw all that bacon away.' Kraft dismisses Finley's retaliation arguments as "irrelevant whataboutisms", a "hopscotch of speculation", and "nothing but his 'feeling.'"[34] This ignores important evidence including: (1) temporal proximity between February 2020 food safety complaints and March 2020 termination (JA 171-72); (2) differential treatment between Finley and Clark regarding the same incident (JA 408-409, 672-673, 396); and (3) evidence of management's negative reactions to Finley's safety concerns. (JA 396, 410-411.)

## ARGUMENT

### III. INTENT AND CAUSATION ARE NOT BURDENS ON FINLEY

#### A. Kraft Heinz Ignores the Holding and Implications of Murray v. UBS

The Supreme Court's decision in *Murray v. UBS Securities, LLC*, 601 U.S. 23 (2024), made clear that under whistleblower statutes such as the Sarbanes-Oxley Act (SOX), a plaintiff need not prove that his protected activity was the but-for cause or the primary motivating factor behind an adverse employment action. Instead, the statute requires only that the protected activity be a "contributing factor" in the decision. Despite this, the two-judge majority in the

---

[33] JA 396, 410-411.
[34] Kraft Br., p. 37, 35-36, 37

Second Circuit's recent remand of *Murray* attempted to evade the high Court holding by (1) discarding the "affected in any way" standard inherent in the statutory language and (2) imposing an actual causation burden—one that almost invariably requires proof of retaliatory intent. The dissent in *Murray*, however, persuasively argued that such an imposition is contrary to both the Supreme Court's holding and the established understanding of whistleblower protections. Finley's opening brief correctly emphasizes that the contributing factor standard is not a causation or animus requirement, but a flexible threshold designed to lower the evidentiary burden on whistleblowers.

Congress intentionally chose a "contributing factor" standard that is less demanding than traditional causation analyses (such as the but-for standard). The legislative history reveals that Congress intended to encourage whistleblowing by ensuring that employees need not overcome the substantial evidentiary burden of proving animus or direct causation. As explained in *Marano v. Dep't of Just.*, 2 F.3d 1137, 1143 (Fed. Cir. 1993)—cited by a unanimous Supreme Court in *Murray*-- Congress adopted language that reflects a lower threshold—one that does not require a showing of retaliatory intent, but only that the protected activity played any role, however minimal, in the employer's adverse action.

### B. **The Second Circuit Majority's Erroneous End-Run in Murray 2**

The majority on remand in *Murray v. UBS*, 128 F.4th 363 (2nd Cir. 2025) sought to redefine "contributing factor" by eliminating the "affected in any way" standard, thereby forcing plaintiffs to prove a more direct causal connection. The majority's opinion imposes a causation burden on the whistleblower by requiring proof that the protected activity directly caused the termination. As Judge Pérez's dissent explains, such a requirement is incompatible with the Supreme Court's interpretation. The dissent correctly notes that under the proper "contributing factor" standard, a plaintiff need only show that its protected activity played some role in the decision—even if it was not the sole or even predominant reason. Imposing a causation standard not only contravenes the Supreme Court's holding in *Murray* but also distorts the remedial purpose of whistleblower statutes by effectively reintroducing a requirement of intent or animus. Judge Pérez's dissent provides a far more cogent analysis of why the majority's imposition of a causation requirement is fundamentally flawed.

Consequently, the Fourth Circuit should reject the *Murray 2* majority's imposition of a causation standard and adopt the dissent's approach, thereby preserving the remedial purpose of whistleblower statutes and ensuring that Finley's claims are evaluated under the proper standard.

## IV. THERE IS DISPUTED EVIDENCE AS TO WHETHER KRAFT HEINZ WOULD HAVE TERMINATED FINLEY ABSENT HIS PROTECTED ACTIVITY.

### A. Kraft-Heinz's "Second-Guessing the Employer" Contention is the Honest Belief Doctrine by another Name.

The Appellee's brief advances an argument that, although it does not expressly label it as the honest belief doctrine, essentially contends that a court should defer to an employer's internal decision honestly but possibly erroneously reached after a thorough investigation. In *Hartzman v. Wells Fargo Advisors, LLC*, No. 1:14CV808, 2017 WL 2982997, at *7 (M.D.N.C. July 12, 2017), the court stated: "[I]t is not the court's role to second-guess a human resources decision that followed a thorough investigation." This language encapsulates the view that an adverse employment decision—once the employer has conducted a comprehensive inquiry—should not be reweighed by the courts to determine if subjective reappraisal motivated the employer's reasoning. *Hartzman* was based on *Wiest v. Tyco Elecs. Corp.,* 812 F.3d 319, 333 (3d Cir. 2016) and *Abels v. DISH Network Serv., LLC,* 507 Fed.Appx. 179, 185 (3d Cir.2012) ("We do not sit as a super-personnel department that reexamines an entity's business decisions."), citing *Feldman v. L. Enf't Assocs. Corp.,* 752 F.3d 339, 350 (4th Cir. 2014) (but we do not decide whether LEA's reason for terminating him was wise, fair, or correct, nor do we "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment

discrimination"), citing DeJarnette *v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir.1998). To the extent that *Feldman* appears to have applied the employer's honest belief defense to a SOX case, that would be legal error. But that error need not be repeated by this Court under the FMSA.

**B. <u>The Honest Belief Doctrine Cannot Apply to Whistleblower Retaliation FSMA Claims</u>**

Some circuits—namely the Third, Seventh, and Tenth—have applied an honest belief defense in FMLA interference or retaliation claims. In *Bachelder v. Am. W. Airlines, Inc*., 259 F.3d 1112 (9th Cir. 2001), the court emphasized that "liability does not depend on its subjective belief" regarding whether leave was protected. By contrast, the Fourth Circuit has not definitively adopted the honest belief doctrine for retaliation claims. In *Shipton v. Baltimore Gas & Elec. Co.,* 109 F.4th 701 (4th Cir. 2024), the court declined to review the application of the doctrine because the issue was not properly preserved on appeal. Similarly, *Sharif v. United Airlines, Inc.,* 841 F.3d 199 (4th Cir. 2016) and *Adkins v. CSX Transp., Inc*., 70 F.4th 785 (4th Cir. 2023) illustrate that when the district court's analysis is firmly anchored in the *McDonnell Douglas* framework, the question of whether an honest belief defense should insulate an employer from liability is left unresolved. This reluctance to embrace the doctrine reflects the circuit's recognition that a subjective inquiry is incompatible with the objective causation requirement underlying retaliation claims.

The FSMA is designed to protect employees who report or reasonably believe that violations of food safety laws, placing on the employee the easiest burden of proof known to employment law, the contributing factor burden with no related burden to prove animus or intent. That legislative scheme is grossly incompatible with a judge-made rule from the cloth of *McDonnel Douglas* permitting an employer to avoid liability defending that it acted on an "honest belief" regarding a whistleblower's conduct. Allowing that defense would effectively shift the inquiry from whether the adverse employment action was causally related to the protected disclosure to an inquiry into the employer's subjective state of mind—a departure from the FSMA's objective remedial structure, and the holding in *Murray v. UBS*.

Accordingly, even if Kraft Heinz honestly believed Mr. Finley was dishonest, such a belief does not satisfy the FSMA's objective standard, nor does it preclude jury or judicial review under the same-action defense. The employer's subjective intent is irrelevant when the statutory mandate is to protect employees from retaliatory conduct that undermines food safety enforcement. Consistent with *Murray v. UBS*, this Court in *Feldman* held that the whistleblower need only show that his protected activities "tended to affect [his] termination in at least some way," whether they were a "primary or even a significant cause" of the termination. *Feldman,* 752 F.3d at 348.

## V. APPELLANT DID NOT WAIVE THE EMPLOYER'S AFFIRMATIVE DEFENSE ARGUMENT, AND THE COURT SHOULD REMAND IT

### A. <u>The Waiver Issue Lacks Merit</u>

A secondary issue raised in Appellee's brief is whether the district court properly resolved the affirmative same-action defense raised by Kraft Heinz, and whether Finley's discussion of that defense in his opening brief was adequate to preserve the issue for appellate review. Although Kraft Heinz contends that Finley merely "took a passing shot" at the issue, a fair reading of Finley's brief is that he provided a significant discussion of the clear and convincing evidence standard governing the same-action defense. The district court's order adopted the Report's conclusions without engaging in any significant analysis of the factual record or explaining how the evidence satisfies the clear and convincing standard. Under the Fourth Circuit's discretionary framework, these combined circumstances demand that the appellate court review—and ultimately remand—the issue for further proceedings.

### B. <u>Discretionary Nature of Appellate Review Under the Fourth Circuit</u>

The Fourth Circuit's jurisprudence is clear that its power to review issues on appeal is not constrained by an inflexible waiver rule. In *U. S. v. Clay*, 627 F.3d 959, 966 n.2 (4th Cir. 2010), the Court explained that it retains the authority to address an argument that a district court may have overlooked, particularly when the issue involves a question of significant legal import. This discretionary power

allows the appellate court to ensure that substantive legal issues receive proper consideration—even if one party's brief might appear to provide only preliminary or "passing" treatment of that issue.

The purpose behind this discretionary authority is twofold. First, it safeguards the integrity of appellate review by preventing the dismissal of important legal issues solely on the basis that a party did not exhaust every nuance in its brief. Second, it incentivizes district courts to offer detailed and reasoned findings on complex matters, while simultaneously permitting the appellate court to fill any gaps where the lower court's explanation is incomplete. In *Manning v. Caldwell*, 930 F.3d 264, 271 (4th Cir. 2019), the Court emphasized that the appellate review process must be able to examine the underlying legal rationale when the record is deficient. This approach ensures that the outcome is anchored in a full understanding of the relevant facts and legal standards.

**C. <u>Why Finley's Treatment Surpasses a "Passing Shot"</u>**

Finley's brief contains an in-depth discussion of the clear and convincing evidence standard as applied to the same-action defense. He explains that clear and convincing evidence "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable'" (Finley Opening Brief, pp. 49–50). By citing *Price v. Symsek* and related authorities, Finley carefully contextualizes this standard and explains its relevance to his case.

He contrasts the subjective interpretation offered by Kraft Heinz with the objective threshold that must be met in establishing the same-action defense. This analysis is supported by detailed factual references—such as the documented messages from Harp and Longerbeam and the corroborative recording—which illustrate that the Report's conclusion was not adequately supported.

The question of waiver on appeal turns on whether a party's treatment of an issue is sufficiently developed. In *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006), the Court held that an argument is waived only if it is treated perfunctorily or as a mere "passing shot." Given the short but weighty content of Finley's discussion, the Fourth Circuit has ample basis to exercise its discretion and review the issue de novo. In *Manning*, 930 F.3d at 271 (4th Cir. 2019), the Court indicated that if the record shows a developed discussion—even if the district court did not fully analyze it—the appellate court may choose to review the issue on its own motion.

## VI. THE AFFIRMATIVE DEFENSE SMITH FACTORS ARE SUFFICIENTLY REFERENCED IN THE OPENING BRIEF

Finley's Opening Brief made factually integrated and comprehensive legal arguments in support of his challenge to the employer's affirmative defense. It is a stark rebuttal to Kraft Heinz's argument that Finley ignored the issue give his clearly labeled in bold and all caps Section XIII: **THERE IS DISPUTED EVIDENCE AS TO WHETHER KRAFT HEINZ WOULD HAVE**

**TERMINATED FINLEY ABSENT HIS PROTECTED ACTIVITY** (pp. 53–54 of the Opening Brief). Moreover, the sole case cited by Kraft Heinz for its affirmative defense three factor analysis is one that Finley himself relied upon--and neither the Magistrate nor the District Judge cited or discussed-- *Smith v. Dep't of Lab.*, 674 F. App'x 309, 315–16 (4th Cir. 2017). This is in addition to Finley's citation to *Stone & Webster Eng'g Corp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir. 1997).

Finley's opening brief goes well beyond a cursory mention by elaborating on the statutory framework set forth in 21 U.S.C. § 399d(b)(2)(C)(iii) and 49 U.S.C. § 42121(b)(2)(B)(iv). His brief explains that once a contributing factor is found, the employer must prove by clear and convincing evidence—evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable—that it would have taken the same unfavorable personnel action absent the protected conduct. Finley's brief cited much more case authority: *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (the demanding nature of the clear and convincing evidence standard); *Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 WL 92984 (C.D. Cal. 2011), and *Donnelly Corp. v. Gentex Corp.*, 913 F. Supp. 1014, 1020 (W.D. Mich. 1995) (discussing at length the high evidentiary threshold of clear and convincing evidence burdens of proof), and *Colorado v. New Mexico,* 467 U.S. 310, 316–17

(1983). In that case, the Supreme Court explained that clear and convincing evidence requires proof that produces in the mind of the trier of fact an abiding conviction that a factual contention is "highly probable." Finley's brief cited *Smith v. DOL* referencing *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997), to underscore that for employers, this standard is deliberately "tough, and not by accident."

Kraft Heinz, doing what the Magistrate and District Judge did not, cites the three Smith factors for the affirmative defense. All are readily rebutted with evidence discussed at length in Finley's opening brief. The Kraft factor evidence and the rebuttal evidence in the opening brief are as follows:

1. **Independent Significance of the Non-Protected Activity:** Appellee argues that Finley's alleged dishonesty—alleged in managerial and decision-maker statements is sufficient on its own. Finley, however, cites his own testimony that his termination was not solely a function of alleged dishonesty but rather it was influenced by deteriorating relationships with supervisors and by his protected disclosures-- which affected if not triggered the investigation.

2. **Evidence of "Would-Have" Termination:** Appellee contends that there is significant evidence showing that Kraft Heinz would have terminated Finley in the same manner, regardless of his protected activity. Finley rebuts this by showing that there is genuine dispute over the timing and causal influence of his

disclosures. His testimony that he "would eventually have gotten terminated" means that while termination might have been inevitable, the timing and manner were affected by antipathy to his protected activity.

3. **Invariance of Facts in the Absence of Protected Activity:** Finally, Appellee argues that if Finley's protected activity were removed from the record, the decision to terminate him would remain unchanged. Finley, however, demonstrates that his protected disclosures were inextricably linked to the investigation into Gaines' termination—including an audio recording of managers referencing protected activity.

**A. <u>The District Court's Narrow Analysis and Its Implications</u>**

Finley's brief also assigned error to the Magistrate and District Court for impermissibly narrowing the scope of relevant evidence, boxing it in so it could not be used to rebut the Smith factors. Specifically, Finley argues that the lower courts limited their inquiry to a pretext analysis rather than considering the full range of evidence that should inform the jury's evaluation of the affirmative defense. For example, the record contains evidence of: (1) Disputes over whether Finley's inconsistent statements stem from a lack of memory or deliberate misrepresentation; (2) Testimony regarding the division of duties between Finley and his supervisors (e.g., Clark's responsibilities versus Finley's); and (3) the secret recording in which Finley referenced his protected activity during the

investigation. The errors and poor documentation in that investigation are highly relevant to how a jury should weigh the evidence regarding the contributing factor, yet the Magistrate and District Judge dismissed that evidence with a version of the employer's honest belief defense. Instead of liberally evaluating these critical issues, the District Judge confined the evidence to a mere pretext analysis. As the opening brief explained, in *Burton v. Food Giant Supermarkets, Inc.*, No. 1:19-cv-2445-JDB-JAY, 2021 WL 3574885, at *8 (W.D. Tenn. Aug. 12, 2021), and *Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021) (quoting *Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 905 (4th Cir. 2017), while an employer's investigation need not be perfect, it must be reasonably informed and considered, which is a jury question. Yet, by limiting its inquiry to pretext, the Court failed to allow a full evaluation of whether the investigation's shortcomings affected the reliability of the evidence regarding Finley's conduct.

Moreover, the Magistrate conflated the burdens of proof by treating evidence that Finley argued showed bias and prejudgment as evidence supporting the employer's claim that it terminated him for dishonesty. The Magistrate stated there was evidence in the record supporting the defendant's assertion that it terminated the plaintiff's employment based on dishonesty and cited internal instant messages exchanged between Mr. Harp and Ms. Longerbeam regarding concerns about Finley's honesty. The Magistrate then made a leap too far under

summary judgment rules and concluded that no reasonable juror could conclude that the plaintiff's complaints about food safety were a contributing factor in his employment termination, relying on *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998), which holds that when an employer articulates a legally permissible reason for termination, it is not the Court's role to judge whether that reason was wise, fair, or correct. This *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) era where the employer had the lightest burden known to employment law to merely "articulate some legitimate, nondiscriminatory reason" for the adverse action, however, is legislatively inapplicable to modern whistleblower statutory analysis; and here whether Finley's protected activity contributed to or "affected in any way" his termination.

### B. The District Court's Inadequate Reasoning and the Need for Remand

The Fourth Circuit requires that district courts provide a clear record of their factual and legal reasoning so that the appellate court can independently evaluate whether the evidentiary standard has been satisfied. In *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012), the Court stressed that de novo review is only possible when the lower court's analysis is detailed and transparent. *Manning v. Caldwell*, 930 F.3d 264, 271 (4th Cir. 2019), further explained that the district court must offer a reasoned analysis of its findings. Without such detailed reasoning, the appellate court is unable to determine whether

the lower court's conclusions are supported by the record. In this case, the district court's order merely adopts the Report's conclusions regarding the same-action defense without providing any detailed explanation of how it weighed the relevant evidence. Although the Report references evidence—such as the messages from Harp and Longerbeam and the recording that corroborates those messages—the district court does not explain how these facts satisfy the clear and convincing evidence standard required for the same-action defense. As a result, the record lacks the necessary analytical detail to permit a full de novo review by the appellate court.

Given the district court's failure to articulate its reasoning, this Court should exercise its discretion to remand the issue for further proceedings along with *Murray v. UBS* issues. Remand is warranted not only because the district court's findings are insufficiently explained, but also because the Fourth Circuit is generally reluctant to resolve factual issues that were never properly addressed at the trial level. See *United States v. Clay*, 627 F.3d 959, 966 n.2 (4th Cir. 2010). Moreover, *Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024) underscores that a detailed, reasoned analysis is indispensable for an adverse finding to withstand de novo review.

## VII. CONCLUSION

For the reasons set forth above, the district court erred in granting summary judgment to Kraft Heinz on Finley's FSMA retaliation claim. *Murray v. UBS* requires reversal.

Respectfully submitted,

/s/ Thad M. Guyer

____________________________

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC

Attorneys for Appellant Wilbert Finley

## CERTIFICATE OF COMPLIANCE

1. This Corrected Reply Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains 5,966 words.

3. I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

Dated: March 11, 2025

/s/ Thad M. Guyer

Thad M. Guyer

**CERTIFICATE OF SERVICE**

SERVED **APPELLANT'S CORRECTED REPLY BRIEF** electronically by ECF and Email on the 11th day of March, 2025 on all counsel of record registered on the Court's ECF service.

/s/ Thad M. Guyer

______________________________

By Thad M. Guyer